## PAPACHRISTOU et al. v. CITY OF JACKSONVILLE

No. 70-5030.   Argued December 8, 1971—Decided February 24, 1972

Douglas, J., delivered the opinion of the Court, in which all Members joined except Powell and Rehnquist, JJ., who took no part in the consideration or decision of the case.

*Samuel S. Jacobson* argued the cause and filed briefs for petitioners.

*T. Edward Austin, Jr.,* argued the cause for respondent.   With him on the brief were *James C. Rinaman, Jr.,* and *J. Edward Wall.*

Mr. Justice Douglas delivered the opinion of the Court.

This case involves eight defendants who were convicted in a Florida municipal court of violating a Jacksonville, Florida, vagrancy ordinance.[1]   Their convictions

---

[1] Jacksonville Ordinance Code § 26-57 provided at the time of these arrests and convictions as follows:

"Rogues and vagabonds, or dissolute persons who go about begging, common gamblers, persons who use juggling or unlawful games or plays, common drunkards, common night walkers, thieves, pilferers or pickpockets, traders in stolen property, lewd, wanton and lascivious persons, keepers of gambling places, common railers and brawlers,

were affirmed by the Florida Circuit Court in a consolidated appeal, and their petition for certiorari was denied by the District Court of Appeal on the authority of *Johnson* v. *State,* 202 So. 2d 852.[2] The case is

persons wandering or strolling around from place to place without any lawful purpose or object, habitual loafers, disorderly persons, persons neglecting all lawful business and habitually spending their time by frequenting houses of ill fame, gaming houses, or places where alcoholic beverages are sold or served, persons able to work but habitually living upon the earnings of their wives or minor children shall be deemed vagrants and, upon conviction in the Municipal Court shall be punished as provided for Class D offenses."

Class D offenses at the time of these arrests and convictions were punishable by 90 days' imprisonment, $500 fine, or both. Jacksonville Ordinance Code § 1–8 (1965). The maximum punishment has since been reduced to 75 days or $450. § 304.101 (1971). We are advised that that downward revision was made to avoid federal right-to-counsel decisions. The Fifth Circuit case extending right to counsel in misdemeanors where a fine of $500 or 90 days' imprisonment could be imposed is *Harvey* v. *Mississippi,* 340 F. 2d 263 (1965).

We are advised that at present the Jacksonville vagrancy ordinance is § 330.107 and identical with the earlier one except that "juggling" has been eliminated.

[2] Florida also has a vagrancy statute, Fla. Stat. § 856.02 (1965), which reads quite closely on the Jacksonville ordinance. Jacksonville Ordinance Code § 27–43 makes the commission of any Florida misdemeanor a Class D offense against the City of Jacksonville. In 1971 Florida made minor amendments to its statute. See Laws 1971, c. 71–132.

Section 856.02 was declared unconstitutionally overbroad in *Lazarus* v. *Faircloth,* 301 F. Supp. 266. The court said: "All loitering, loafing, or idling on the streets and highways of a city, even though habitual, is not necessarily detrimental to the public welfare nor is it under all circumstances an interference with travel upon them. It may be and often is entirely innocuous. The statute draws no distinction between conduct that is calculated to harm and that which is essentially innocent." *Id.,* at 272, quoting *Hawaii* v. *Anduha,* 48 F. 2d 171, 172. See also *Smith* v. *Florida, post,* p. 172.

The Florida disorderly conduct ordinance, covering "loitering about any hotel, block, barroom, dramshop, gambling house or

158

here on a petition for certiorari, which we granted. 403 U. S. 917. For reasons which will appear, we reverse.

At issue are five consolidated cases. Margaret Papachristou, Betty Calloway, Eugene Eddie Melton, and Leonard Johnson were all arrested early on a Sunday morning, and charged with vagrancy—"prowling by auto."

Jimmy Lee Smith and Milton Henry were charged with vagrancy—"vagabonds."

Henry Edward Heath and a codefendant were arrested for vagrancy—"loitering" and "common thief."

Thomas Owen Campbell was charged with vagrancy—"common thief."

Hugh Brown was charged with vagrancy—"disorderly loitering on street" and "disorderly conduct—resisting arrest with violence."

The facts are stipulated. Papachristou and Calloway are white females. Melton and Johnson are black males. Papachristou was enrolled in a job-training program sponsored by the State Employment Service at Florida Junior College in Jacksonville. Calloway was a typing and shorthand teacher at a state mental institution located near Jacksonville. She was the owner of the automobile in which the four defendants were arrested. Melton was a Vietnam war veteran who had been released from the Navy after nine months in a veterans' hospital. On the date of his arrest he was a part-time computer helper while attending college as a full-time student in Jacksonville. Johnson was a tow-motor operator in a grocery chain warehouse and was a lifelong resident of Jacksonville.

At the time of their arrest the four of them were riding

---

disorderly house, or wandering about the streets either by night or by day without any known lawful means of support, or without being able to give a satisfactory account of themselves" has also been held void for "excessive broadness and vagueness" by the Florida Supreme Court, *Headley* v. *Selkowitz*, 171 So. 2d 368, 370.

in Calloway's car on the main thoroughfare in Jacksonville. They had left a restaurant owned by Johnson's uncle where they had eaten and were on their way to a nightclub. The arresting officers denied that the racial mixture in the car played any part in the decision to make the arrest. The arrest, they said, was made because the defendants had stopped near a used-car lot which had been broken into several times. There was, however, no evidence of any breaking and entering on the night in question.

Of these four charged with "prowling by auto" none had been previously arrested except Papachristou who had once been convicted of a municipal offense.

Jimmy Lee Smith and Milton Henry (who is not a petitioner) were arrested between 9 and 10 a. m. on a weekday in downtown Jacksonville, while waiting for a friend who was to lend them a car so they could apply for a job at a produce company. Smith was a part-time produce worker and part-time organizer for a Negro political group. He had a common-law wife and three children supported by him and his wife. He had been arrested several times but convicted only once. Smith's companion, Henry, was an 18-year-old high school student with no previous record of arrest.

This morning it was cold, and Smith had no jacket, so they went briefly into a dry cleaning shop to wait, but left when requested to do so. They thereafter walked back and forth two or three times over a two-block stretch looking for their friend. The store owners, who apparently were wary of Smith and his companion, summoned two police officers who searched the men and found neither had a weapon. But they were arrested because the officers said they had no identification and because the officers did not believe their story.

Heath and a codefendant were arrested for "loitering" and for "common thief." Both were residents of Jacksonville, Heath having lived there all his life and being

employed at an automobile body shop. Heath had previously been arrested but his codefendant had no arrest record. Heath and his companion were arrested when they drove up to a residence shared by Heath's girl friend and some other girls. Some police officers were already there in the process of arresting another man. When Heath and his companion started backing out of the driveway, the officers signaled to them to stop and asked them to get out of the car, which they did. Thereupon they and the automobile were searched. Although no contraband or incriminating evidence was found, they were both arrested, Heath being charged with being a "common thief" because he was reputed to be a thief. The codefendant was charged with "loitering" because he was standing in the driveway, an act which the officers admitted was done only at their command.

Campbell was arrested as he reached his home very early one morning and was charged with "common thief." He was stopped by officers because he was traveling at a high rate of speed, yet no speeding charge was placed against him.

Brown was arrested when he was observed leaving a downtown Jacksonville hotel by a police officer seated in a cruiser. The police testified he was reputed to be a thief, narcotics pusher, and generally opprobrious character. The officer called Brown over to the car, intending at that time to arrest him unless he had a good explanation for being on the street. Brown walked over to the police cruiser, as commanded, and the officer began to search him, apparently preparatory to placing him in the car. In the process of the search he came on two small packets which were later found to contain heroin. When the officer touched the pocket where the packets were, Brown began to resist. He was charged with "disorderly loitering on street" and "dis-

orderly conduct—resisting arrest with violence." While he was also charged with a narcotics violation, that charge was *nolled.*

Jacksonville's ordinance and Florida's statute were "derived from early English law," *Johnson* v. *State,* 202 So. 2d, at 854, and employ "archaic language" in their definitions of vagrants. *Id.,* at 855. The history is an oftentold tale. The breakup of feudal estates in England led to labor shortages which in turn resulted in the Statutes of Laborers,[3] designed to stabilize the labor force by prohibiting increases in wages and prohibiting the movement of workers from their home areas in search of improved conditions. Later vagrancy laws became criminal aspects of the poor laws. The series of laws passed in England on the subject became increasingly severe.[4]

---

[3] 23 Edw. 3, c. 1 (1349); 25 Edw. 3, c. 1 (1350).

[4] See 3 J. Stephen, History of the Criminal Law of England 203–206, 266–275; 4 W. Blackstone, Commentaries *169.

*Ledwith* v. *Roberts,* [1937] 1 K. B. 232, 271, gives the following summary:

"The early Vagrancy Acts came into being under peculiar conditions utterly different to those of the present time. From the time of the Black Death in the middle of the 14th century till the middle of the 17th century, and indeed, although in diminishing degree, right down to the reform of the Poor Law in the first half of the 19th century, the roads of England were crowded with masterless men and their families, who had lost their former employment through a variety of causes, had no means of livelihood and had taken to a vagrant life. The main causes were the gradual decay of the feudal system under which the labouring classes had been anchored to the soil, the economic slackening of the legal compulsion to work for fixed wages, the break up of the monasteries in the reign of Henry VIII, and the consequent disappearance of the religious orders which had previously administered a kind of 'public assistance' in the form of lodging, food and alms; and, lastly, the economic changes brought about by the Enclosure Acts. Some of these people were honest labourers who had fallen upon evil days, others were the 'wild rogues,' so common in Elizabethan times and literature, who had been born to a life of idleness and had no

But "the theory of the Elizabethan poor laws no longer fits the facts," *Edwards* v. *California,* 314 U. S. 160, 174. The conditions which spawned these laws may be gone, but the archaic classifications remain.

This ordinance is void for vagueness, both in the sense that it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States* v. *Harriss,* 347 U. S. 612, 617, and because it encourages arbitrary and erratic arrests and convictions. *Thornhill* v. *Alabama,* 310 U. S. 88; *Herndon* v. *Lowry,* 301 U. S. 242.

Living under a rule of law entails various suppositions, one of which is that "[all persons] are entitled to be informed as to what the State commands or forbids." *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453.

*Lanzetta* is one of a well-recognized group of cases insisting that the law give fair notice of the offending conduct. See *Connally* v. *General Construction Co.,* 269 U. S. 385, 391; *Cline* v. *Frink Dairy Co.,* 274 U. S. 445; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81. In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed. *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337; *United States* v. *National Dairy Products Corp.,* 372 U. S. 29; *United States* v. *Petrillo,* 332 U. S. 1.

The poor among us, the minorities, the average householder are not in business and not alerted to the regula-

---

intention of following any other. It was they and their confederates who formed themselves into the notorious 'brotherhood of beggars' which flourished in the 16th and 17th centuries. They were a definite and serious menace to the community and it was chiefly against them and their kind that the harsher provisions of the vagrancy laws of the period were directed."

And see Sherry, Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision, 48 Calif. L. Rev. 557, 560–561 (1960); Note, The Vagrancy Concept Reconsidered: Problems and Abuses of Status Criminality, 37 N. Y. U. L. Rev. 102 (1962).

tory schemes of vagrancy laws; and we assume they would have no understanding of their meaning and impact if they read them. Nor are they protected from being caught in the vagrancy net by the necessity of having a specific intent to commit an unlawful act. See *Screws* v. *United States,* 325 U. S. 91; *Boyce Motor Lines, Inc.* v. *United States, supra.*

The Jacksonville ordinance makes criminal activities which by modern standards are normally innocent. "Nightwalking" is one. Florida construes the ordinance not to make criminal one night's wandering, *Johnson* v. *State,* 202 So. 2d, at 855, only the "habitual" wanderer or, as the ordinance describes it, "common night walkers." We know, however, from experience that sleepless people often walk at night, perhaps hopeful that sleep-inducing relaxation will result.

Luis Munoz-Marin, former Governor of Puerto Rico, commented once that "loafing" was a national virtue in his Commonwealth and that it should be encouraged. It is, however, a crime in Jacksonville.

"[P]ersons able to work but habitually living upon the earnings of their wives or minor children"—like habitually living "without visible means of support"—might implicate unemployed pillars of the community who have married rich wives.

"[P]ersons able to work but habitually living upon the earnings of their wives or minor children" may also embrace unemployed people out of the labor market, by reason of a recession [5] or disemployed by reason of technological or so-called structural displacements.

---

[5] In *Edwards* v. *California,* 314 U. S. 160, 177, in referring to *City of New York* v. *Miln,* 11 Pet. 102, 142, decided in 1837, we said: "Whatever may have been the notion then prevailing, we do not think that it will now be seriously contended that because a person is without employment and without funds he constitutes a 'moral pestilence.' Poverty and immorality are not synonymous."

Persons "wandering or strolling" from place to place have been extolled by Walt Whitman and Vachel Lindsay.[6] The qualification "without any lawful purpose or object" may be a trap for innocent acts. Persons "neglecting all lawful business and habitually spending their time by frequenting . . . places where alcoholic beverages are sold or served" would literally embrace many members of golf clubs and city clubs.

Walkers and strollers and wanderers may be going to or coming from a burglary. Loafers or loiterers may be "casing" a place for a holdup. Letting one's wife support him is an intra-family matter, and normally of no concern to the police. Yet it may, of course, be the setting for numerous crimes.

The difficulty is that these activities are historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence.

They are embedded in Walt Whitman's writings, especially in his "Song of the Open Road." They are reflected, too, in the spirit of Vachel Lindsay's "I Want to Go Wandering," and by Henry D. Thoreau.[7]

---

[6] And see Reich, Police Questioning of Law Abiding Citizens, 75 Yale L. J. 1161, 1172 (1966): "If I choose to take an evening walk to see if Andromeda has come up on schedule, I think I am entitled to look for the distant light of Almach and Mirach without finding myself staring into the blinding beam of a police flashlight."

[7] "I have met with but one or two persons in the course of my life who understood the art of Walking, that is, of taking walks,— who had a genius, so to speak, for *sauntering:* which word is beauti-

This aspect of the vagrancy ordinance before us is suggested by what this Court said in 1876 about a broad criminal statute enacted by Congress: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States* v. *Reese,* 92 U. S. 214, 221.

While that was a federal case, the due process implications are equally applicable to the States and to this vagrancy ordinance. Here the net cast is large, not to give the courts the power to pick and choose but to increase the arsenal of the police. In *Winters* v. *New York,* 333 U. S. 507, the Court struck down a New York statute that made criminal the distribution of a magazine made up principally of items of criminal deeds of bloodshed or lust so massed as to become vehicles for inciting violent and depraved crimes against the person. The infirmity the Court found was vagueness—the absence of "ascertainable standards of guilt" (*id.,* at 515) in the

---

fully derived 'from idle people who roved about the country, in the Middle Ages, and asked charity, under pretence of going *à la Sainte Terre,*' to the Holy Land, till the children exclaimed, 'There goes a *Sainte Terrer,*' a Saunterer, a Holy-Lander. They who never go to the Holy Land in their walks, as they pretend, are indeed mere idlers and vagabonds; but they who do go there are saunterers in the good sense, such as I mean. Some, however, would derive the word from *sans terre,* without land or a home, which, therefore, in the good sense, will mean, having no particular home, but equally at home everywhere. For this is the secret of successful sauntering. He who sits still in a house all the time may be the greatest vagrant of all; but the saunterer, in the good sense, is no more vagrant than the meandering river, which is all the while sedulously seeking the shortest course to the sea. But I prefer the first, which, indeed, is the most probable derivation. For every walk is a sort of crusade, preached by some Peter the Hermit in us, to go forth and reconquer this Holy Land from the hands of the Infidels." Excursions 251–252 (1893).

sensitive First Amendment area.[8]   Mr. Justice Frank-
furter dissented.   But concerned as he, and many others,[9]
had been over the vagrancy laws, he added:

> "Only a word needs to be said regarding *Lanzetta*
> v. *New Jersey,* 306 U. S. 451.   The case involved a
> New Jersey statute of the type that seek to control
> 'vagrancy.'   These statutes are in a class by them-
> selves, in view of the familiar abuses to which they
> are put. . . .   Definiteness is designedly avoided so
> as to allow the net to be cast at large, to enable men
> to be caught who are vaguely undesirable in the eyes
> of police and prosecution, although not chargeable
> with any particular offense.   In short, these 'va-
> grancy statutes' and laws against 'gangs' are not
> fenced in by the text of the statute or by the sub-
> ject matter so as to give notice of conduct to be
> avoided."   *Id.,* at 540.

Where the list of crimes is so all-inclusive and gen-
eralized [10] as the one in this ordinance, those convicted

---

[8] For a discussion of the void-for-vagueness doctrine in the area
of fundamental rights see Note, The Void-For-Vagueness Doc-
trine in the Supreme Court, 109 U. Pa. L. Rev. 67, 104 *et seq.;*
Amsterdam, Federal Constitutional Restrictions on the Punishment
of Crimes of Status, Crimes of General Obnoxiousness, Crimes of
Displeasing Police Officers, and the Like, 3 Crim. L. Bull. 205, 224
*et seq.* (1967).

[9] See *Edelman* v. *California,* 344 U. S. 357, 362 (Black, J., dissent-
ing); *Hicks* v. *District of Columbia,* 383 U. S. 252 (DOUGLAS, J.,
dissenting); *District of Columbia* v. *Hunt,* 82 U. S. App. D. C. 159,
163 F. 2d 833 (Judge Stephens writing for a majority of the Court
of Appeals); Judge Rudkin for the court in *Hawaii* v. *Anduha,* 48
F. 2d 171.

The opposing views are numerous: *Ex parte Branch,* 234 Mo. 466,
137 S. W. 886; H. R. Rep. No. 1248, 77th Cong., 1st Sess., 2;
Perkins, The Vagrancy Concept, 9 Hastings L. J. 237 (1958);
*People* v. *Craig,* 152 Cal. 42, 91 P. 997.

[10] President Roosevelt, in vetoing a vagrancy law for the District
of Columbia, said:

"The bill contains many provisions that constitute an improvement

may be punished for no more than vindicating affronts to police authority:

"The common ground which brings such a motley assortment of human troubles before the magistrates in vagrancy-type proceedings is the procedural laxity which permits 'conviction' for almost any kind of conduct and the existence of the House of Correction as an easy and convenient dumping-ground for prob-

over existing law. Unfortunately, however, there are two provisions in the bill that appear objectionable.

"Section 1 of the bill contains a number of clauses defining a 'vagrant.' Clause 6 of this section would include within that category 'any able-bodied person who lives in idleness upon the wages, earnings, or property of any person having no legal obligation to support him.' This definition is so broadly and loosely drawn that in many cases it would make a vagrant of an adult daughter or son of a well-to-do family who, though amply provided for and not guilty of any improper or unlawful conduct, has no occupation and is dependent upon parental support.

"Under clause 9 of said section 'any person leading an idle life . . . and not giving a good account of himself' would incur guilt and liability to punishment unless he could prove, as required by section 2, that he has lawful means of support realized from a lawful occupation or source. What constitutes 'leading an idle life' and 'not giving a good account of oneself' is not indicated by the statute but is left to the determination in the first place of a police officer and eventually of a judge of the police court, subject to further review in proper cases. While this phraseology may be suitable for general purposes as a definition of a vagrant, it does not conform with accepted standards of legislative practice as a definition of a criminal offense. I am not willing to agree that a person without lawful means of support, temporarily or otherwise, should be subject to the risk of arrest and punishment under provisions as indefinite and uncertain in their meaning and application as those employed in this clause.

"It would hardly be a satisfactory answer to say that the sound judgment and decisions of the police and prosecuting officers must be trusted to invoke the law only in proper cases. The law itself should be so drawn as not to make it applicable to cases which obviously should not be comprised within its terms." H. R. Doc. No. 392, 77th Cong., 1st Sess.

lems that appear to have no other immediate solution." Foote, Vagrancy-Type Law and Its Administration, 104 U. Pa. L. Rev. 603, 631.[11]

Another aspect of the ordinance's vagueness appears when we focus, not on the lack of notice given a potential offender, but on the effect of the unfettered discretion it places in the hands of the Jacksonville police. Caleb Foote, an early student of this subject, has called the vagrancy-type law as offering "punishment by analogy." *Id.*, at 609. Such crimes, though long common in Russia,[12] are not compatible with our constitutional

[11] Thus, "prowling by auto," which formed the basis for the vagrancy arrests and convictions of four of the petitioners herein, is not even listed in the ordinance as a crime. But see *Hanks* v. *State*, 195 So. 2d 49, 51, in which the Florida District Court of Appeal construed "wandering or strolling from place to place" as including travel by automobile.

[12] J. Hazard, The Soviet Legal System 133 (1962):

"The 1922 code was a step in the direction of precision in definition of crime, but it was not a complete departure from the concept of punishment in accordance with the dictates of the social consciousness of the judge. Laying hold of an old tsarist code provision that had been in effect from 1864 to 1903 known by the term 'analogy,' the Soviet draftsmen inserted an article permitting a judge to consider the social danger of an individual even when he had committed no act defined as a crime in the specialized part of the code. He was to be guided by analogizing the dangerous act to some act defined as crime, but at the outset the analogies were not always apparent, as when a husband was executed for the sadistic murder of a wife, followed by dissection of her torso and shipment in a trunk to a remote railway station, the court arguing that the crime was analogous to banditry. At the time of this decision the code permitted the death penalty for banditry but not for murder without political motives or very serious social consequences."

"On the traditionally important subject of criminal law, Algeria is rejecting the flexibility introduced in the Soviet criminal code by the 'analogy' principle, as have the East-Central European and black African states." Hazard, The Residue of Marxist Influence in Algeria, 9 Colum. J. of Transnat'l L. 194, 224 (1970).

system. We allow our police to make arrests only on "probable cause,"[13] a Fourth and Fourteenth Amendment standard applicable to the States[14] as well as to the Federal Government. Arresting a person on suspicion, like arresting a person for investigation, is foreign to our system, even when the arrest is for past criminality. Future criminality, however, is the common justification for the presence of vagrancy statutes. See Foote, *supra*, at 625. Florida has, indeed, construed her vagrancy statute "as necessary regulations," *inter alia*, "to deter vagabondage and prevent crimes." *Johnson* v. *State*, 202 So. 2d 852; *Smith* v. *State*, 239 So. 2d 250, 251.

A direction by a legislature to the police to arrest all "suspicious" persons[15] would not pass constitutional muster. A vagrancy prosecution may be merely the cloak for a conviction which could not be obtained on the real but undisclosed grounds for the arrest. *People*

---

[13] *Johnson* v. *United States*, 333 U. S. 10, 15–17.

[14] *Whiteley* v. *Warden*, 401 U. S. 560.

[15] On arrests for investigation, see Secret Detention by the Chicago Police, A Report by the American Civil Liberties Union (1959). The table below contains nationwide data on arrests for "vagrancy" and for "suspicion" in the three-year period 1968–1970.

| Year* | Vagrancy | | Suspicion | | Combined Offenses | |
|---|---|---|---|---|---|---|
| | Total rptd. arrests | Rate per 100,000 | Total rptd. arrests | Rate per 100,000 | Total rptd. arrests | Rate per 100,000 |
| 1968 ........ | 99,147 | 68.2 | 89,986 | 61.9 | 189,133 | 130.1 |
| 1969 ........ | 106,269 | 73.9 | 88,265 | 61.4 | 194,534 | 135.3 |
| 1970 ........ | 101,093 | 66.7 | 70,173 | 46.3 | 171,266 | 113.0 |
| 3-year averages ...... | 102,170 | 69.6 | 82,808 | 56.5 | 184,978 | 126.1 |

*Reporting agencies represent population of: 1968—145,306,000; 1969—143,815,000; 1970—151,604,000.

Source: FBI Uniform Crime Reports, 1968–1970.

v. *Moss,* 309 N. Y. 429, 131 N. E. 2d 717.   But as Chief Justice Hewart said in *Frederick Dean,* 18 Crim. App. 133, 134 (1924):

> "It would be in the highest degree unfortunate if in any part of the country those who are responsible for setting in motion the criminal law should entertain, connive at or coquette with the idea that in a case where there is not enough evidence to charge the prisoner with an attempt to commit a crime, the prosecution may, nevertheless, on such insufficient evidence, succeed in obtaining and upholding a conviction under the Vagrancy Act, 1824."

Those generally implicated by the imprecise terms of the ordinance—poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the lifestyle deemed appropriate by the Jacksonville police and the courts.   Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law.   It furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure."   *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98.   It results in a regime in which the poor and the unpopular are permitted to "stand on a public sidewalk . . . only at the whim of any police officer."   *Shuttlesworth* v. *Birmingham,* 382 U. S. 87, 90.   Under this ordinance,

> "[I]f some carefree type of fellow is satisfied to work just so much, and no more, as will pay for one square meal, some wine, and a flophouse daily, but a court thinks this kind of living subhuman, the fellow can be forced to raise his sights or go to jail as a vagrant."   Amsterdam, Federal Constitutional Restrictions on the Punishment of Crimes of Status,

Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like, 3 Crim. L. Bull. 205, 226 (1967).

A presumption that people who might walk or loaf or loiter or stroll or frequent houses where liquor is sold, or who are supported by their wives or who look suspicious to the police are to become future criminals is too precarious for a rule of law. The implicit presumption in these generalized vagrancy standards—that crime is being nipped in the bud—is too extravagant to deserve extended treatment. Of course, vagrancy statutes are useful to the police. Of course, they are nets making easy the roundup of so-called undesirables. But the rule of law implies equality and justice in its application. Vagrancy laws of the Jacksonville type teach that the scales of justice are so tipped that even-handed administration of the law is not possible. The rule of law, evenly applied to minorities as well as majorities, to the poor as well as the rich, is the great mucilage that holds society together.

The Jacksonville ordinance cannot be squared with our constitutional standards and is plainly unconstitutional.

*Reversed.*

Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision of this case.