**Stephen Earl SQUIRE, Petitioner,**

**v.**

**Raymond C. PACE, City Sheriff, Circuit Courthouse, For the City of Charlottesville, Charlottesville, Virginia, Respondent.**

**Civ. A. No. 74-27.**

United States District Court,
W. D. Virginia,
Charlottesville Division.

Aug. 9, 1974.

John C. Lowe, Lowe & Gordon, Charlottesville, Va., for petitioner.

Richard H. Barrick, Commonwealth's Atty., Charlottesville, Va., for respondent.

## OPINION and ORDER

TURK, Chief Judge.

In this petition for a writ of habeas corpus, Steven Earl Squire challenges his conviction for disorderly conduct in the Corporation Court for the City of Charlottesville, Virginia on October 13, 1972, for which he was sentenced to serve a term of four months in jail and pay a fine of $600. Petitioner appealed his conviction to the Virginia Supreme Court alleging among other grounds for reversal the same contentions that he now asserts here. The Virginia Supreme Court granted an appeal on a single ground not here relevant, dismissed petitioner's other grounds for relief and upheld his conviction. Petitioner then sought a Writ of Certiorari in the Supreme Court of the United States which was denied on May 28, 1974. Since petitioner has exhausted his state court remedies, the merits of his constitutional challenges to his conviction may now be entertained by this court, 28 U.S.C. § 2254.

Briefly summarized primarily from the testimony of the prosecution's witnesses, the following events leading to petitioner's arrest occurred. On April 29, 1972, petitioner went to Scott Stadium at the University of Virginia to express his opposition to the involvement of the United States in the Vietnam war. The setting for his protest was the annual review of ROTC units at the University of Virginia. The ceremony consisted of a band playing for the audience; a review of the ROTC units by the President of the University, a visiting dignitary and the commanding officers of the various ROTC units; and an awards ceremony. The first three or four rows of seats in the middle section of the stadium had been set aside for the reviewing party.

Before the reviewing party had taken their seats, petitioner and two others arrived at the stadium and took seats on the wall in front of the reserved seats. Each held a sign expressing opposition to the war with petitioner's sign stating something to the effect that "In Vietnam we killed millions to avoid a bloodbath." At that point, there was no activity on the field other than the band being in position at one end of the field, although the reviewing party was expected to arrive at their seats and the planned activities were scheduled to begin momentarily.

David Alan Williams, Vice-President for Student Affairs at the University, testified that he had the responsibility for maintaining the orderly functioning

of university activities. Upon seeing petitioner and the two other persons sitting on the wall in front of the reserved area, he approached petitioner and told him that it was a reserved area, that he was blocking the view of the spectators, and that he would have to get out. Petitioner and the others made no effort to move, whereupon Mr. Williams grabbed the signs from petitioner and one of the other men. Petitioner then came down from the wall brushing Mr. Williams slightly in an effort to retrieve his sign. Mr. Williams then grabbed him by the collar or neck and swung him down on the seat. Petitioner began to shout about wanting his sign back and how he felt his right to free speech was being violated; a few people from the stands gathered around and there was shouting from the spectators. Petitioner stood up and was again grabbed by Mr. Williams. Petitioner continued shouting about his rights.

Meanwhile Robert Canevari, the Dean of Students, arrived on the scene and signaled for two police officers at the top of the stands to come down. According to Officer Albert, the arresting officer, he had been at the top of the stands where he could see the confrontation between petitioner and Mr. Williams including seeing Mr. Williams grab the sign and petitioner come down from the wall; but he stated that he could not tell exactly what was going on. He came down from the top of the stands on Mr. Canevari's signal who then instructed him to remove petitioner. He accordingly told petitioner "Let's go", to which petitioner did not respond but continued shouting about his sign. Officer Albert repeated the command, and petitioner asked if he was under arrest; the officer answered in the affirmative, and petitioner asked what the charges were; the officer then grabbed petitioner by the wrist and led him without resistance out of the stands. When in the police car he was informed that he was under arrest for disorderly conduct. At the time petitioner was approached by Officer Albert, he was seated and engaged in a loud argument with Mr. Williams about getting his sign back and did not appear to realize that the police had arrived.

Virginia, like many other states, has a two-tier system for trying minor crimes such as disorderly conduct. Pursuant to this system misdemeanors are tried in the courts-not-of-record (now called General District Courts) in the first instance with a right to appeal and a trial *de novo* in a court of record (now Circuit Courts). Petitioner was tried on May 11, 1972 in the Municipal Court for the City of Charlottesville before substitute Judge E. C. Wingfield, who found him guilty of disorderly conduct and sentenced him to a suspended 30 day jail sentence and a $25 fine. Petitioner appealed to the Corporation Court for the City of Charlottesville where he was afforded a *de novo* trial before a five-person jury which, as noted, found him guilty and sentenced him to four months in jail and a $600 fine.

Petitioner here challenges his aforementioned conviction on the following three grounds which will be discussed in the order stated:

(1) That his rights under the Sixth and Fourteenth Amendments were violated in that a juror was allowed to sit on the case who on *voir dire* admitted that he considered a University administrator or a police officer inherently more credible than an anti-war demonstrator;

(2) That in his trial in the Corporation Court for the City of Charlottesville, evidence of alleged misconduct for which he had been acquitted in the Municipal Court was used against him in violation of his right guaranteed by the Fifth and Fourteenth Amendments not to twice be put in jeopardy for the same offense;

(3) That the statute pursuant to which he was convicted, Va.Code Ann. § 18.1–253.2 (1973 Cum. Supp.) is facially unconstitu-

tionally vague and overbroad in violation of the First and Fourteenth Amendments.

## I

On *voir dire* examination petitioner's counsel asked the jury panel if they believed that a police officer or a University official were inherently more credible than an anti-war demonstrator. Two members of the panel, Henshaw and Bernet, responded affirmatively to these questions, and petitioner's counsel moved to disqualify them for cause. The judge did not immediately disqualify them but instead allowed further questioning. On the basis of additional questioning Henshaw was disqualified but Bernet was not.

On subsequent questioning Mr. Bernet explained his earlier response as follows:

"I did answer the first question affirmatively and that I had not formed an opinion and I though that I could judge it in an unbiased manner. The reason I raised my hand I think was not so much against a war demonstrator as in favor of a police officer. A police officer has been associated with the importance of telling the truth a great deal more than an anti-war demonstrator. A police officer I think would have to be older, more settled, is my only reason for answering . . ."

Mr. Bernet then answered in response to a question from petitioner's counsel that he believed he could give a fair and impartial trial to both sides even though he knew that an anti-war demonstrator was the defendant. He further stated with respect to giving defendant a fair trial:

"I said I could. I do believe I can. I think maybe one thing is I was stating as a whole class, not in specific examples. I would certainly listen to what the police officer had to say, and I would certainly listen to what the anti-war demonstrator had to say and would try to do this impartially."

From a consideration of the entire *voir dire* examination of Mr. Bernet, this court does not believe that the fundamental fairness mandated by the Due Process Clause of the Fourteenth Amendment was violated by the trial judge's failure to strike Mr. Bernet for cause. In Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) the Supreme Court held that the failure of a state trial judge to inquire into prospective juror's racial bias violated the Fourteenth Amendment; but the court went on to hold that the failure to question jurors concerning prejudice against persons with beards was not a constitutional violation.

"Given the traditionally broad discretion accorded to the trial judge in conducting *voir dire,* Aldridge v. United States, *supra* [283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054], and our inability to constitutionally distinguish possible prejudice against beards from a host of possible similar prejudices, we do not believe petitioner's constitutional rights were violated when the trial judge refused to put his question. . . . The trial judge's refusal to inquire as to a particular bias against beards, after his inquiries as to bias in general does not reach the level of a constitutional violation. 409 U.S. at 528, 93 S.Ct. at 851.

Although the issue in *Ham* is somewhat different than that in this case, the court is of the opinion that the Supreme Court's deference to the trial judge's discretion in *Ham* supports the conclusion that no constitutional violation occurred with respect to the *voir dire* examination in this case. Petitioner's counsel was permitted to explore Bernet's prejudices against anti-war demonstrators, and taken as a whole his responses justified the trial judge's conclusion that he could impartially judge the case.

## II

Petitioner's second challenge to his conviction is based on the assertion that

at his initial trial in the Municipal Court the judge stated certain reasons for finding him guilty, yet at his trial *de novo* in the Corporation Court evidence of other acts of alleged misconduct was admitted in evidence, thus allowing the jury to convict him for acts that he had been acquitted for below. At his first trial, the judge made the following statement:

COURT: "I might say this. We have a lot of evidence in here that's been relevant, a lot of it that's been irrelevant, but I'm drawn to this conclusion from these facts. There was a sign that said either "kill" or "murder" and murder is a right serious word. To display a sign in a place that people have got to look at it and accusing the military of murder is very likely to cause some disturbance, it's calculated to cause some disturbance and to place it in a position that people are bound to look at it, they can't help but see it instead of seeing what they came there to see, is forcing your opinion on somebody else and doing it in a manner that is likely to cause disturbance. And I think anything that is likely to cause disturbance is pretty apt to be disorderly conduct. And, as I said before, I think the Court can draw conclusions on what evidence you've got before you and the relevantly (sic) undisputed evidence in this case is this. That the Defendant carried this sign and you know what . . . he didn't know exactly but probably contained the word murder. He wasn't particular to know exactly what it did say, either kill or murder, at a particular place, and the manner in which he display it, not only was likely to cause disturbance, but did cause a disturbance. Now that is the issue here. It was more than apt to bring about a riot. Were it was . . . You've got to consider what took . . . not only what took place but where it took place and under what circumstances it took place. So, for those reasons I find him guilty and we'll put a fine of $25.00 and I'm going to

give him a jail sentence of six months. The Attorney for the Commonwealth has asked that if I give him a jail sentence that it be suspended. I'm going to suspend it, I'm going to suspend it only on the condition that he pay the fine and costs and good behavior for 12 months."

Petitioner makes two points with respect to the above statement. First, he argues that the statement indicates that he was convicted for unconstitutional reasons. Secondly, he argues that since he was forced to challenge his conviction by a trial *de novo*, collateral estoppel should have operated to prevent the State from presenting evidence beyond that relied on by the trial judge in finding him guilty in the first instance; and the failure to so limit the case against him on appeal amounted to double jeopardy in violation of the Fifth and Fourteenth Amendments to the Constitution.

In support of this argument petition refers to Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) in which the court held that the concept of collateral estoppel was embodied in the constitutional proscription against double jeopardy. In that case, Ashe had been charged along with three other men with the armed robbery of six poker players. Ashe was tried for the robbery of one of the six victims and found not guilty due to insufficient evidence. The State thereafter again prosecuted him, this time for the robbery of another of the victims. The second trial resulted in a verdict of guilty. The Supreme Court concluded that the first jury had found that Ashe had not been one of the robbers, and therefore a second prosecution for robbery of another of the victims was constitutionally barred by the rule of collateral estoppel as embodied in the guarantee against double jeopardy. Petitioner also cites United States v. Drevetzki, 338 F.Supp. 403 (N.D.Ill.1972) in which the court held that defendant's acquittal on charges of interstate theft prevented a subsequent perjury prosecu-

tion based on defendant's testimony at the first trial.

These cases are distinguishable in terms of the context in which the subsequent prosecution occurred. The above cases as well as others following the decision in *Ashe, supra,* arose in the context of subsequent prosecutions for separate offenses for which the defendant had been implicitly acquitted in an initial trial; whereas, in the case at bar the subsequent trial occurred in the context of a *de novo* appeal from the initial conviction. In both trials petitioner was charged and convicted of the single statutory offense of disorderly conduct arising out of his actions at Scott Stadium on April 29, 1972.[1]

In Colten v. Kentucky, 407 U.S. 104 at 112, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) the Court considered a challenge to the two-tier system for minor criminal cases in Kentucky. The defendant there had been convicted of disorderly conduct in the county court and fined $10; he then exercised his right to a *de novo* trial in the Circuit Court and was again convicted, although this time he was fined $50. Defendant challenged his second conviction as violating due process and double jeopardy. The Court rejected defendant's due process challenge which was based on North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In *Pearce* the Court had held that where a defendant successfully challenges his original conviction and is thereafter reconvicted a more severe sentence is violative of due process absent an affirmative showing of objective reasons concerning the defendant's identifiable conduct after the initial sentencing. The reason for this result was that of preventing vindictiveness in resentencing and to ensure that defendants were not deterred from challenging their convictions. The

Court found the Kentucky two-tier system unlike that in *Pearce* and stated:

"The trial *de novo* represents a completely fresh determination of guilt or innocence. It is not an appeal on the record. As far as we know, the record from the lower court is not before the superior court and is irrelevant to its proceedings. In all likelihood, the trial *de novo* court is not even informed of the sentence imposed in the inferior court and can hardly be said to have 'enhanced' the sentence." 407 U.S. at 117–118, 92 S.Ct. at 1961 (footnote omitted).

The Court also rejected defendant's double jeopardy challenge on the authority of *Pearce*:

"The *Pearce* Court rejected the same contention in the context of that case, 395 U.S. at 719–720, 89 S.Ct. 2072. *Colten* urges that his claim is stronger because the Kentucky system forces a defendant to expose himself to jeopardy as a price for securing a trial that comports with the Constitution. That was, of course, the situation in *Pearce,* where reversal of the first conviction was for constitutional error." 407 U.S. at 119, 92 S.Ct. at 1961.

■ This court has previously found the Virginia procedure for the trial of minor crimes to be "virtually identical to that in Kentucky." McClung v. Weatherholtz, 351 F.Supp. 5, 8 (W.D. Va.1972); and although petitioner's challenge to his conviction based on alleged double jeopardy is slightly different from that in *Colten,* in both cases the challenge is against the two-tier system by means of attempting to limit the proceedings in the superior court on the basis of what occurred in the inferior court. As in *Colten,* petitioner was forced to expose himself to a *de novo*

---

1. This of course distinguishes this case from Buck v. City of Danville, 213 Va. 387, 192 S.E.2d 758 (1972) in which the Virginia Supreme Court held that a defendant who was tried in the municipal court on a warrant charging him with driving under the influ-

ence of alcohol but who was convicted of the lesser included offense of impaired driving, could not then be convicted in a *de novo* trial in the Corporation Court of driving under the influence of alcohol without running afoul of the double jeopardy clause.

trial to correct what he believed was constitutional error, and as in *Colten* his second trial was independent of the lower court determination. Petitioner was not tried in the Corporation Court for a greater or different offense than in the inferior court. Petitioner's challenge is based simply on what was said by the judge in the lower court, but to allow these impromptu remarks to limit the trial in the Corporation Court for the same offense would destroy the *de novo* nature of the second trial.[2] In light of *Colten* this court perceives no double jeopardy in the petitioner's second trial, and his challenge to his conviction on this ground is accordingly rejected.

### III

Petitioner's third challenge to his conviction raises the question of the facial constitutionality of the statute on grounds of vagueness and overbreadth. This challenge in actuality raises two issues because the constitutional concepts of vagueness and overbreadth, while related and at times overlapping, protect distinct constitutional values. See, e. g., Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

The doctrine of vagueness has its genesis in the due process clause of the Fourteenth Amendment. The primary infirmity of an unconstitutionally vague statute is its failure to give fair notice and warning as to what conduct is proscribed. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. General Construction Company, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

Secondly and of equal importance is the concern that vague laws allow "policemen, prosecutors and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting standards of the criminal law." Smith v. Goguen, 415 U.S. 566, at 574, 94 S.Ct. 1242, at 1248, 39 L.Ed.2d 605 (1974). As noted in *Papachristou, supra*, 405 U.S. at 167, 92 S.Ct. at 846, a vaguely defined crime allows punishment "for no more than vindicating affronts to police authority." *Accord*, Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

A third constitutional value encompassed in the doctrine of vagueness, and one which is closely related to the concept of overbreadth, is that the potential scope of vague laws might infringe freedoms guaranteed by the First Amendment. Because of the possibly inhibiting effect on the exercise of First Amendment rights in the case of certain vague statutes, an even greater degree of specificity has been required in such cases. *E. g., Grayned*, supra, 408 U.S. at 109, 92 S.Ct. 2294; Smith v. Goguen, supra, 415 U.S. at 573, 94 S.Ct. 1242.

The related doctrine of overbreadth, like that of vagueness focuses on precision in drafting, but its concern is limited to protecting the favored rights of the First Amendment. The infirmity of overbreadth exists when a law "sweeps within its prohibitions what may not be

---

2. Although a defendant apparently may have the lower court proceedings transcribed, as was done by petitioner, this is not frequently done, and when it is the expense is borne by the defendant. If the *de novo* trial could be limited by what was said in the lower court, transcripts would doubtlessly be considered necessary in many or most cases. This in turn would weaken one of the justifications for the two-tier system noted by the Court in *Colten*, namely that of providing "speedier and less costly adjudications than may be possible in the criminal courts of general jurisdiction where the full range of constitutional guarantees is available." 407 U.S. at 114, 92 S.Ct. at 1959.

punished under the First and Fourteenth Amendments." *Grayned*, supra, 408 U.S. at 115, 92 S.Ct. at 2302. The concern of the courts in fashioning and applying the doctrine of overbreadth is that of ensuring that broad-gauged statutes are not allowed to deter through fear the exercise of First Amendment rights. *E. g.*, Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L. Ed.2d 214 (1974); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L. Ed.2d 214 (1971).

■ The question is thus whether, in light of the above-stated principles, the Virginia disorderly conduct statute is unconstitutionally vague or overbroad on its face. The statute in issue, Va.Code Ann. § 18.1–253.2 (1973 Supp.), provides in pertinent part:

> If any person behaves in a riotous or disorderly manner in any street, highway, public building or any other public place, other than those mentioned in the preceding section (§ 18.1–253.-1), or causes any unnecessary disturbance in or on any public conveyance by running through it, climbing through windows or upon the seats, failing to move to another seat when lawfully requested to so move by the operator, otherwise annoying passengers or employees therein, he shall be guilty of a misdemeanor.

Specifically, petitioner was convicted of behaving in a riotous or disorderly manner in a public place (Scott Stadium). The operative words—"behaves in a riotous or disorderly manner"—provide practically no guidance to the individual who might violate the statute or to police, prosecutors, judges or juries who are given the authority to enforce it. But the words themselves are only the first consideration, for the construction of those words by the state courts is equally germane in assessing their constitutionality. See, Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L. Ed.2d 408 (1972); Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972).

In Hackney v. Commonwealth, 186 Va. 888, 45 S.E.2d 241 (1947) the Virginia Supreme Court considered the application of the disorderly conduct statute in the context of a case in which a son, standing on his porch, used "vile and abusive" language to his mother passing along a public highway, which was overheard by at least two other persons. The bulk of the opinion in *Hackney* concerned whether a person had to be physically present in a public place in order to violate the statute, but the court noted with regard to the defendant's conduct:

> It is conceded that the language used constitutes disorderly conduct within the usual definition of that term, which is 'all such acts and conduct as are of a nature to corrupt the public morals or to outrage the sense of public decency, whether committed by words or acts.' [Quoting 17 Am.Jur. 99] 186 Va. at 890, 45 S.E.2d at 242.

In Taylor v. Commonwealth, 187 Va. 214, 46 S.E.2d 384 (1948) the Virginia Supreme Court again considered the statute, although this case is only marginally relevant to the case at bar because the defendant was alleged to have violated the second clause of the statute by failing to move to the rear of a bus when requested by the driver to do so. The Court reversed the defendant's conviction holding that the words "any unnecessary disturbance" in the statute were related to the words "riotous or disorderly" which was the gist of the crime. The Court then held:

> She had not disturbed any person or persons, or caused any commotion affecting, in any degree, the peace or good order of the bus. Neither her words or her acts had a vicious or injurious tendency, offensive to good morals or public decency.

Respondent cites no other cases construing § 18.1–253.2, and the court is thus limited to consideration of the above constructions placed on the words

"riotous or disorderly." The judicial gloss placed on these words has simply been that of asking whether a given set of facts amounts to a corruption of public morals or an outrage to public decency. Rather than limiting the open-ended scope of the statute, such an approach magnifies its infirmities.

Although petitioner does not challenge the disorderly conduct statute in its specific application to him, but rather limits his constitutional attack to its facial validity,[3] the application in this case is instructive in pointing out the inherent problems of both vagueness and overbreadth in the statute.

With respect to vagueness, it appears that each of the three constitutional values discussed above were violated by the statute in this case. First, it was virtually impossible for petitioner to know which of his actions and reactions would violate the statute. Before the scheduled ceremony began, petitioner sat on the wall holding a sign which blocked the view of some of the spectators; he was approached by Mr. Williams and told to move which he did not immediately do with the result that his sign was snatched from him; he loudly protested the taking of his personal property and was pushed down into a seat by Mr. Williams; and when the police finally arrived and at Mr. Canevari's or-der told petitioner to leave, he did not immediately do so but significantly asked if he were under arrest and what were the charges. In view of petitioner's right to be at the stadium and express his views, the court cannot conceive that petitioner would reasonably be on notice that any of the above actions amounted to riotous or disorderly conduct, a corruption of public morals or an outrage to public decency.

Secondly, this case demonstrates that neither the officer who arrested petitioner nor the judge and later the jury who convicted him were limited by the statute from making *ad hoc* legislative judgments in terms of their own predilections as to what should be considered disorderly or riotous behavior. It is not clear from the record as to exactly why the police officer arrested petitioner. He indicated at the trial that there might have been enough disorder on petitioner's part prior to his arrival on the scene to justify the arrest, but also indicated that he did not know exactly what had happened. Upon arriving at the scene of the confusion, he did not question those present to find out what had occurred but instead followed Mr. Canevari's order to get petitioner out of there. The officer also indicated that the petitioner's failure to immediately leave might have justified the arrest, but the delay was occasioned by nothing

3. In recent Supreme Court decisions, the majority and minority decisions have divided sharply over the issue of "standing" to challenge state statutes on grounds of facial vagueness and overbreadth. When the majority has considered the merits of such a challenge irrespective of the specific facts of the case, Lewis v. City of New Orleans, supra; Gooding v. Wilson, supra; Colten v. Kentucky, supra; Coates v. City of Cincinnati, supra; the dissenting justices have criticized such an approach for failing to consider the words of the statute "in context rather than dissected with surgical precision using a semantic scapel," 405 U.S. at 529, 92 S.Ct. at 1109 (Burger, C. J., dissenting), and relegating the facts to footnote status, *Lewis*, supra (Blackmun, J., dissenting). When the minority in the above cases has become the majority, the facts of the case have become paramount. *E. g.*, Broad-rick v. Oklahoma, 413 U.S. 601, 608, 93 S. Ct. 2908, 37 L.Ed.2d 830 (1973); California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L. Ed.2d 342 (1972). However, in the case at bar there is no need to choose between these disparate approaches because the facts of the case and the nature of the statute belie any suggestion that petitioner was a "hard-core" violator to whom the statute was not vague. The statute "is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" Smith v. Goguen, supra, 415 U.S. at 578, 94 S.Ct. at 1249; quoting *Coates* supra, 402 U.S. at 614, 91 S.Ct. at 1688. Similarly, the factual context of petitioner's arrest demonstrates the inherent overbreadth of the statute.

more than petitioner's legitimate questions of whether he was under arrest and what the charges were.[4] Suffice it to say that the statute itself provided virtually no limitation on the exercise of the officer's discretion.[5] Likewise, the judge and jury were left practically unrestrained by the statute. The jury was instructed that if they believed that petitioner acted in a riotous or disorderly manner in Scott Stadium on April 29, 1972, they should find him guilty; and they were also instructed that "disorderly conduct is such behavior as tends to disturb public peace or good order." At the time of petitioner's conviction, the country was polarized over the war with feelings running high on both sides, and doubtless many people (apparently including the Municipal Court Judge) would consider the carrying of a sign pointing out the seamier side of war at an ROTC ceremony as behavior that tends to disturb the public peace or good order. Although the court believes that any conviction under a statute as vague as this one would run afoul of the Due Process Clause of the Fourteenth Amendment, this problem is particularly acute in this case because of the political setting in which his behavior occurred.

Finally, the Virginia disorderly conduct statute is unconstitutionally vague and overbroad because of its strong potential for inhibiting the exercise of First Amendment rights. As noted, disorderly conduct has been construed by the Virginia Supreme Court as words or acts which are of a nature to corrupt the public morals or outrage the sense of public decency; and at petitioner's trial, the jury was instructed that disorderly conduct is "such behavior as tends to disturb public peace or good order." The fatal lack of solicitude for First Amendment rights in the above definitions of disorderly conduct is cogently demonstrated by the following quotation

4. If in fact petitioner was arrested for failing to immediately move when directed to do so, this case becomes strikingly similar to Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). In that case, there was a lawful protest march, but when onlookers and bystanders became unruly, the police ordered the demonstrators to disperse. When this command was not obeyed, the demonstrators were arrested for disorderly conduct. The Court reversed the conviction because neither the ordinance nor the charge defined disorderly conduct as failure to obey a police order, and there was no evidence that petitioner's conduct was in fact disorderly. In addition, the court noted that the trial judge's charge allowed the jury to convict for conduct protected by the First Amendment and the conviction could also be reversed on this ground. Likewise in Norwell v. City of Cincinnati, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) petitioner was arrested for disorderly conduct (under a statute considerably more precise than the Virginia statute) because he verbally and negatively protested the actions of a police officer in detaining and questioning him. In reversing the conviction, the Court noted, "surely, one is not to be punished for non-provocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." 414 U.S. at 16, 94 S.Ct. at 188. These cases clearly demonstrate that there was possibly an unconstitutional application of the statute in the case at bar, which as noted, is not an issue raised by petitioner. Nevertheless, the court notes that petitioner's questions to the police officer were certainly reasonable and justified in view of the facts that he had every right to be at the ceremony to exercise his First Amendment rights, and it was Mr. Williams's reaction to the place he chose to express himself which precipitated the disorder.

5. The concurring opinion of Mr. Justice Powell in Lewis v. City of New Orleans, supra is especially appropriate to the Virginia disorderly conduct statute:

"This ordinance, as construed by the Louisiana Supreme Court, confers on police a virtually unrestrained power to arrest and charge persons with a violation. Many arrests are made in "one-on-one" situations where the only witnesses are the arresting officer and the person charged. All that is required for conviction is that the court accept the testimony of the officer. . . . . . The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident."

from Terminiello v. Chicago, 337 U.S. 1 at 4, 69 S.Ct. 894 at 896, 93 L.Ed. 1131 (1949):

> "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."

It is obvious that the statute on its face and as construed fails to protect the rights of individuals to express their point of view in public without fear of arrest because of the hostility that might be engendered in others.

Again, the facts surrounding petitioner's arrest and conviction are instructive. Although it is clear that petitioner was arrested for more than merely carrying a sign expressing his political point of view; it is also clear that his conviction was inexorably intertwined with and flowed from the expression of protected speech and Mr. Williams' reaction to the time, manner and place chosen for this expression. It is beyond dispute that the state may reasonably limit the time, manner, and place of expression, see Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and it is thus possible that under a more specific statute or regulation petitioner could have been convicted of blocking the view of others or refusing to move to a location set aside for the demonstration. But the disorderly conduct statute undertakes no such balancing of the competing interests of the individual and the public at large. Instead of being confronted with standards governing the location of his protest, petitioner was confronted with the orders and actions of Mr. Williams and the possibility that his reaction to Mr. Williams' hostility might be deemed "to disturb the public peace or good order." This was no standard at all, and it is apparent that the lack of guidance in the statute creates a risk of arrest to any individual contemplating the expression of a particular point of view deemed inappropriate by those in power.

The conclusion that the Virginia disorderly conduct statute is unconstitutionally vague and overbroad is particularly apparent when it is compared with similar but more precise criminal statutes which have been struck down in recent years. *E. g.*, Lewis v. City of New Orleans, supra; Gooding v. Wilson, supra; Coates v. Cincinnati, supra; Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

Finally a useful comparison further demonstrating the constitutional infirmities in the Virginia statute is provided from a consideration of the Kentucky disorderly conduct statute upheld in Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). The contrast between the Virginia and Kentucky statutes is striking. Not only did the Kentucky statute specify with greater particularity the substantive behavior prohibited, but it required as an element of the crime that a defendant have the intent to cause public inconvenience, annoyance or alarm or recklessly create a risk thereof. Furthermore, this intent was construed by the Kentucky Court of Appeals to mean predominant intent which was to be determined from a consideration of whether a defendant had intended to exercise a constitutional right and if so, the significance of this in comparison with the annoyance, inconvenience etc. caused. The Virginia statute not only fails to specify with any particularity whatsoever the conduct proscribed, there is no element of intent required and no consideration given to exercise of constitutional rights.

On the basis of the reasons and authority stated, it is accordingly Adjudged and Ordered that:

(1) Section 18.1–253.2 of the Code of Virginia is unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments of the Constitution of the United States; and

(2) the petition for a writ of habeas corpus is accordingly granted and petitioner's conviction by the Corporation Court for the City of Charlottesville on October 13, 1972 for violating the aforementioned statute is hereby vacated.

(3) Since petitioner was released on bail from the custody of respondent by order of this court dated July 3, 1974, no further action by respondent is now required.