**Thomas GRAY, Plaintiff**

v.

**Mark E. KOHL, in his official capacity as State Attorney for the Sixteenth Judicial Circuit of Florida; Richard D. Roth, in his official capacity as Monroe County Sheriff, Defendants.**

**No. 07–10024–CIV.**

United States District Court,
S.D. Florida.

June 18, 2008.

---

Arthur Spiegel, Esq., Miami, FL, Benjamin W. Bull, Esq., Jeremy D. Tedesco, Esq. Joshua B. Bolinger, Esq. Scottsdale, AZ, Dvid Andrew Cortman, Esq., Lawrenceville, GA, for Plaintiff.

Richard A. Giuffreda, Esq., Jason Lee Scarberry, Esq., Purdy Jolly Giuffreda & Barranco, P.A., Ft. Lauderdale, FL, for Defendants.

### ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT: GRANTING DEFENDANT RICHARD D. ROTH'S MOTION FOR SUMMARY JUDGMENT

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant Richard D. Roth's Motion

for Summary Judgment (dkt. # 84) and Plaintiff's Motion for Summary Judgment (dkt. # 85).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I. BACKGROUND

This action arises from Defendants' prohibition of Plaintiff Thomas Gray's ("Gray") distribution of Bibles on a public sidewalk within 500 feet of Key Largo School, a school safety zone pursuant to the Florida School Safety Zone Statute. § 810.0975, Fla. Stat. Gray claims the statute is unconstitutional for vagueness and overbreadth. The School Safety Zone Statute states, in relevant part:

(2)(a) Each principal or designee of each public or private school in this state shall notify the appropriate law enforcement agency to prohibit any person from loitering in the school safety zone who does not have legitimate business in the school safety zone or any other authorization, or license to enter or remain in the school safety zone or does not otherwise have invitee status in the designated safety zone.

(b) During the period from 1 hour prior to the start of a school session until 1 hour after the conclusion of a school session, it is unlawful for any person to enter the premises or trespass within a school safety zone or to remain on such premises or within such school safety zone when that person does not have legitimate business in the school safety zone or any other authorization, license, or invitation to enter or remain in the school safety zone. Any person who violates this subsection commits a misdemeanor of the second degree....

(c) Any person who does not have legitimate business in the school safety zone or any other authorization, license, or invitation to enter or remain in the school safety zone who shall willfully fail to remove himself or herself from the school safety zone after the principal or designee, having a reasonable belief that he or she will commit a crime or is engaged in harassment or intimidation of students entering or leaving school property, requests him or her to leave the school safety zone commits a misdemeanor of the second degree Nothing in this section shall be construed to abridge or infringe upon the right of any person to peaceably assemble and protest.

(d) This section does not apply to residents or persons engaged in the operation of a licensed commercial business within the school safety zone.

§ 810.0975(2), Fla. Stat. Section 810.0975(1) defines a "school safety zone" as being "within 500 feet of any real property owned by or leased to any public or private elementary, middle, or high school or school board and used for elementary, middle, or high school education."

The following facts are set forth in the Complaint. Gray, a resident of Key Largo, Florida, and member of Gideons International ("Gideons"), feels a religious desire and obligation to share his religion with others. Compl. ¶¶ 25–26. One way Plaintiff shares his religion is by distributing Bibles in public. *Id.* at ¶ 27.

Key Largo has one road, U.S. 1, that spans its entire length. *Id.* at 137. Monroe County built and maintains a public bike path/sidewalk that abuts the east side of U.S. 1 for approximately twenty miles in Key Largo. *Id.* at ¶ 38. This public bike path/sidewalk is open and accessible to the public and is regularly used by community members for walking, running, biking, and other activities. *Id.* at 139. The public bike path/sidewalk runs in front of com-

mercial businesses, government buildings, personal residences, and public and private schools. *Id.* at 140.

Many activities occur within 500 feet of Key Largo School between one hour prior to school beginning and one hour after school ends. *Id.* at ¶ 41. The public bike path/sidewalk abutting U.S. 1 and Key Largo School is located within 500 feet of the school to both the north and south and is routinely used by community members as they talk, walk, bike, and jog. *Id.* at ¶¶ 42–43. Many businesses are located within 500 feet of Key Largo School, including a pet motel, a gas station, "The Cracked Conch" restaurant, and a plumbing business. *Id.* at ¶¶ 45–46. Also within 500 feet of the school is a church, as well as a building where trucks are housed. *Id.* at ¶¶ 5354. Numerous residences are also located within 500 feet of the school. *Id.* at ¶ 47.

The Gideons' procedure for handing out Bibles from the public bike path/sidewalk abutting school grounds is as follows: (1) approximately two weeks prior to the distribution, a member calls the appropriate police department to notify them of distribution; (2) ten to fifteen minutes prior to distribution, a few Gideon members give school administrators notice that they will be handing out Bibles after classes are dismissed; (3) Gideon members are instructed that they must stand on the public bike path/sidewalk during distribution and are not permitted on school grounds; and (4) Gideon members are instructed not to force Bibles on anyone. *Id.* at 158.

In December of 2006, several Gideons, including Gray, distributed Bibles at Coral Shores High School. *Id.* at 159. Coral Shores High School is located approximately five miles from Key Largo School and is adjacent to the same public bike path/sidewalk that abuts Key Largo School. *Id.* at ¶¶ 60–61. Approximately two weeks before the planned distribution

at Coral Shores, Gray called Deputy Ralph Williams at the Monroe County Sheriff's Office and informed him of the plans to distribute Bibles. *Id.* at 162. Deputy Williams stated that the distribution was permissible and that he would be at the school on the day of distribution. *Id.* at 163. On the day of distribution, Deputy Williams, his Sergeant, and several other officers showed the Gideons where to stand on the public bike path/sidewalk. *Id.* at 165. The Gideons stood on the public bike path/sidewalk next to the entrances and exits to Coral Shores and distributed Bibles from these positions. *Id.* at ¶ 66. There were no problems during the Coral Shores distribution. *Id.* at ¶ 67.

The following month, on January 19, 2007, Gray and other Gideons distributed Bibles at Key Largo School. *Id.* at 169. Approximately two weeks prior to the distribution at Key Largo School, Gray contacted Deputy Williams to inform him of the planned distribution at Key Largo School. *Id.* at 170. Gray contacted Deputy Williams three times to give him notice. *Id.* at 1170–71. Deputy Williams told Gray that the planned distribution from the public bike path/sidewalk at Key Largo School was permissible. *Id.* at H70–71. Deputy Williams also informed Gray that the school resource officer at Key Largo School would be out of town during the distribution, but that the school would have no problem with the distribution. *Id.* at 172.

Gray arrived at Key Largo School at approximately 2:00 p.m. on January 19, 2007. *Id.* at 173. Gray and another Gideon member then went to the school administration building to inform the Principal of the planned Bible distribution, but the Principal was not available. *Id.* at 176–78. Gray also spoke with Florida State Patrol Officer, Gretchen Glenn, who was in the school office at this time, and Officer Glenn

gave no indication that the Bible distribution was problematic. *Id.* at ¶¶ 81–82.

Gray then returned to the other Gideons on the public bike path/sidewalk and positioned himself on the public bike path/sidewalk by the school crosswalk. *Id.* at H83–85. Shortly after Gray took his position by the crosswalk, the Principal came out of the school and stared at Gray for a few minutes. *Id.* at ¶ 89. She did not approach or speak to Gray and she did not witness Plaintiff handing out any Bibles. *Id.* At about 3:20 p.m., Deputy Williams stopped at Gray's position to see how distribution was going. *Id.* at 188. For the duration of the time he distributed Bibles at the school, Gray stood on the public bike path/sidewalk and did not cross onto school grounds. *Id.* at 190.

At approximately 3:30 p.m., Gray received a call on his cell phone from a fellow Gideon member who was distributing Bibles at the school that day. *Id.* at ¶ 91. The caller informed Gray that he and another Gideon member were being arrested. *Id.* at 192. Gray stopped distributing Bibles, put them back in his truck, and walked up to the school's north exit. *Id.* at 194. There were approximately five to six Sheriff's Officers present. *Id.* at 195. Gray identified himself as the Gideon member in charge and asked the officers who was in charge. They all indicated that Officer John Perez was the arresting Officer. *Id.* at 196. Gray approached Officer Perez and asked what the charges were. Officer Perez was highly agitated and said that Gray would know in forty-eight hours when he received the report. *Id.* at 198.

Gray then called Deputy Williams and asked for his assistance. *Id.* at ¶ 101. Deputy Williams indicated that he would email Officer Perez. *Id.* at ¶ 102. Gray told Officer Perez that he had an email in his car from another officer stating that the Gideons have a right to distribute Bibles from the public bike path/sidewalk, but Officer Perez indicated that he did not care. *Id.* at ¶¶ 103–106. Gray immediately ceased his Bible distribution. *Id.* at ¶ 123. Gray has not returned to distribute Bibles on public sidewalks within 500 feet of school property due to his fear of arrest and prosecution. *Id.* at 1124. The Gideons who Officer Perez arrested were charged with violating the School Safety Zone Statute but were never convicted. Amended Information, Case No.'s 2007–MM149–A–P and 2007–MM0149–B–P, (Sixteenth Judicial Circuit for Monroe County, Fla., Upper Keys Div. March 13, 2007).

On April 20, 2007, Gray filed the Verified Complaint in this case, stating five (5) causes of action: (1) violation of the right to freedom of speech under the First Amendment; (2) violation of the Due Process Clause of the Fourteenth Amendment; (3) violation of the Equal Protection Clause of the Fourteenth Amendment; (4) violation of the right to free exercise of religion under the First Amendment as incorporated and applied through the Fourteenth Amendment; and (5) violation of Florida's Religious Freedom Restoration Act ("FRFRA").[1]

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambigu-

---

**1.** In an Order dated November 14, 2007 (dkt. # 63), adopting the Report and Recommendation of United States Magistrate Judge Garber (dkt. # 50), and again in an Order also dated November 14, 2007 (dkt. # 64), this Court found that Plaintiff has standing to challenge the statute. In the same Order (dkt. # 64), the FRFRA claim was dismissed because Florida has not waived its Eleventh Amendment immunity for suits in federal court under the FRFRA and the claims against Officer Perez in his official capacity were dismissed because they were redundant to the claims against Sheriff Roth in his official capacity.

ously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142(1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

### A. *Vagueness*

 Gray facially challenges § 810.0975 (the "School Safety Zone Statute") on grounds that it is unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *see Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); Village of *Hoffman Estates v. Flipside*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Smith v. Goguen*, 415 U.S. 566, 573–74, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). "'In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.'" *Kolender*, 461 U.S. at 355, 103 S.Ct. 1855 (quoting *Village of Hoffman Estates*, 455 U.S. at 494 n. 5, 102 S.Ct. 1186). Criminal penalties are scrutinized more closely for vagueness than civil penalties because the consequences of imprecise criminal statutes are more severe. *Village of Hoffman Estates*, 455 U.S. at 499–500, 102 S.Ct. 1186. "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.*

#### 1. Notice

 "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Morales*, 527

U.S. at 56, 119 S.Ct. 1849 (citing *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Village of Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ in its application violates the first essential of due process of law." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

### a. Subsection (2)(b)

■ Subsection (2)(b) of the School Safety Zone Statute prohibits any person from entering the school safety zone during certain hours of the day unless they have "legitimate business" within the school safety zone. "Legitimate business" is not defined in the statute and there is no scienter requirement. The statute exempts residents, persons engaged in the operation of a licensed commercial business, or persons having another authorization, license or invitation to enter or remain in the school safety zone. § 810.0975(2)(b), (3), Fla. Stat. Violation of this portion of the statute contains no prerequisite that a person refuse to leave the area once notified that they have no "legitimate business" in the school safety zone. An individual is in violation of subsection (2)(b) as soon as they enter the school safety zone during an applicable time of day without "legitimate business" to justify their presence. Because the school safety zone extends 500 feet outward from the perimeter of school property, the school safety zone around Key Largo School encompasses residential neighborhoods, businesses and sidewalks on both sides of U.S. 1. Therefore, people in any of these areas who are not exempt may be convicted of a second degree misdemeanor unless they are in the school safety zone on "legitimate business."

By its terms, the School Safety Zone Statute passes constitutional muster only if "legitimate business" reasonably informs individuals of ordinary intelligence of the acts that will render them in violation of the statute. Florida's appellate courts have never had occasion to define, clarify or narrow the meaning of "legitimate business" within the context of § 810.0975. However, other Florida statutes and municipal ordinances have used the term "legitimate business" to define permissible conduct. Former Jacksonville municipal curfew ordinance § 614.104 prohibited minors under 16 from loitering or wandering on public streets between the hours of 12:00 a.m. and sunrise unless accompanied by a parent or on "legitimate business." The First District Court of Appeal of Florida found the ordinance unconstitutionally vague because the term "legitimate business" "did not provide sufficient guidance to parties as to what conduct was prohibited." *K.L.J. v. State of Florida,* 581 So.2d 920, 922 (Fla. 1st DCA 1991). Additionally, Florida's statute prohibiting trespass upon school grounds prohibits any person not having "legitimate business on the campus" from entering or remaining on the campus. § 810.097(1), Fla. Stat. The Third District Court of Appeal of Florida has held that the term "legitimate business on the campus" means "any purpose for being [on campus] which is connected with the operation of the school." *A.C. v. The State of Florida,* 538 So.2d 136, 137 (Fla.

3rd DCA 1989).[2] Accordingly, the court found that the statute was not unconstitutionally vague because it sufficiently described the type of activity that would expose a person to criminal liability. *Id.; see also J.H. v. State of Florida*, 625 So.2d 883 (Fla. 1st DCA 1993).

■ Here, § 810.0975(2)(b) has no language, such as "on campus," that limits the scope of "legitimate business." Therefore, no inference limiting the scope of "legitimate business" to any purpose connected to the purpose of the school is warranted. Even if such an inference could be extrapolated from the text of the statute, to do so would increase the sweep of the statute by criminalizing the presence of any non-exempt person within 500 feet of school property who enters or remains in the area with no reason connected to the purpose of the school. Given the wide range of non-exempt persons and the various types of areas within the school safety zone, such as sidewalks, residential houses and streets, businesses, parking lots, etc., construing "legitimate purpose" to mean any purpose which is connected with the operation of the school would result in an application so broad that it would likely infringe on First and Fourteenth Amendment rights. Moreover, "[t]he Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *Morales*, 527 U.S. at 60, 119 S.Ct. 1849 (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1875)). Therefore, given that Florida's appellate courts have not limited the scope of "legitimate business" for purposes of the School Safety Zone Statute, this Court must rely solely on the text of the statute to determine if it is unconstitutionally vague. *See Kolender*, 461 U.S. at 355, 103 S.Ct. 1855.

This Court finds that subsection (2)(b) of the School Safety Zone Statute is unconstitutionally vague because it does not provide citizens of ordinary intelligence with reasonable notice of the types of acts that the statute criminalizes. The term "legitimate business" requires citizens to guess at the conduct that falls within the statute's ambit and to speculate concerning whether their reason for being in the school safety zone is legitimate enough. The vagueness that dooms this statute is not the product of uncertainty about the normal meaning of "legitimate business," but rather about what "legitimate business" is covered by the statute and what is not. *Morales*, 527 U.S. at 60, 119 S.Ct. 1849; *see Allen v. City of Bordentown*, 216 N.J.Super. 557, 565, 524 A.2d 478 (1987) (finding curfew statute unconstitutionally vague because the words "legitimate business" are unduly subjective and fail to provide fair notice of proscribed conduct). "Thus, the [statute] is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of ordinary intelligence must necessarily guess at its meaning.'" *Coates*, 402 U.S. at 614, 91 S.Ct. 1686 (quoting *Connally*, 269 U.S. at 391, 46 S.Ct. 126). Such "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294. (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)).

With respect to the imprecise scope of conduct proscribed by the School Safety

---

**2.** The court in *A.C. v. The State of Florida* was interpreting § 228.091(2), Fla. Stat., the predecessor to the current trespass upon school grounds statute, § 810.097, Fla. Stat.

Zone Statute, the statute is similar to the ordinance held unconstitutionally vague in *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). In *Coates,* the Court assessed the constitutionality of a Cincinnati ordinance making it a criminal offense for "three or more persons to assemble ... on any of the sidewalks ... and there conduct themselves in a manner annoying to persons passing by." *Id.* The Court held that the ordinance's prohibition against annoying behavior was unconstitutionally vague because it provided an unascertainable standard that failed to describe the proscribed conduct with reasonable specificity, especially since "conduct that annoys some people does not annoy others." *Id.* at 614, 91 S.Ct. 1686. As a result, enforcement of the statute would necessarily depend on whether or not a policeman was annoyed. *Id.*

Here, citizens are no more likely to successfully ascertain what constitutes "legitimate business" because the term is purely subjective. The term "legitimate business" describes conduct at least as imprecisely as does the word "annoying," because what constitutes an emergency to one person, and thus "legitimate business," may be a mere trifle to another. Similarly, what constitutes a moral imperative to one person, and thus "legitimate business," may be an inconvenience or annoyance to another. Although "legitimate business" is not an intrinsically indiscernible term, and indeed may even have a generally accepted usage, it does not describe a range of conduct with the specificity required of a penal statute to enable a person of ordinary intelligence to avoid having to speculate at its meaning. Therefore, the School Zone Safety Statute is unconstitutionally vague because it fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Morales,* 527 U.S. at 56, 119 S.Ct. 1849.

b. Subsection (2)(c)

■ Subsection (2)(c) gives rise to a criminal penalty if a person fails to vacate the school safety zone after being instructed to do so by a principal or designee who reasonably believes a crime is about to be committed or that the person is engaged in harassment or intimidation of students. An argument could therefore be made that subsection (2)(c) provides sufficient notice of proscribed conduct because a person will always be adverted to the prohibited conduct by the principal or designee and will also have an opportunity to leave the school safety zone before the conduct becomes a crime.

■ However, the vagueness of a statute that lacks clarity and precision sufficient to provide a citizen of ordinary intelligence with notice of the conduct it prohibits cannot be remedied by a provision that permits a potential offender to cease the activity once they are advised that their conduct is proscribed by the statute. *See Morales,* 527 U.S. at 58, 119 S.Ct. 1849 (rejecting city's assertion that gang congregation ordinance provided fair notice of proscribed conduct where no violation of the ordinance occurred until a person failed to respond to an order of dispersal). This is so for two reasons. First, because an order to leave the school safety zone can only be given once the prohibited conduct has already occurred, the statute fails to provide the advance notice that will protect a citizen from being ordered to leave the school safety zone in the first instance. *Id.* at 59, 119 S.Ct. 1849. "Such an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible applications of the law." *Id.; see Wright v. Georgia,* 373 U.S. 284, 292, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963) (stating that "a generally worded statute that is construed to pun-

ish conduct that cannot be constitutionally punished is unconstitutionally vague to the extent that it fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute"). Second, the School Safety Zone Statute fails to define how long a person must leave the covered area or whether they can return by simply subjectively deciding that they have a reason that better approximates "legitimate business." Although this lack of clarity alone is not fatal, it further demonstrates the arbitrary and inscrutable nature of a statute that relies on "legitimate business" as a measuring rod for defining prohibited conduct. *See Morales,* 527 U.S. at 59–60, 119 S.Ct. 1849.

Unlike subsection (2)(b), however, in addition to being present within a school safety zone without "legitimate business," no offense results under subsection (2)(c) unless a person refuses an order by a principal or designee to leave the school safety zone. No order to vacate may issue unless the principal or designee has "a reasonable belief that [the person] will commit a crime or is engaged in harassment or intimidation." § 810.0975(2)(c), Fla. Stat. The effect of this additional limitation is that a person is proscribed from being in a school safety zone without "legitimate business," but may not be asked to leave, and therefore runs no risk of violating subsection (2)(c), unless the principal or designee reasonably believes the person will commit a crime or is engaged in harassment or intimidation. In other words, although the statute proscribes entry into a school safety zone without "legitimate business," the mere act of doing so does not constitute criminal conduct unless accompanied by other evidence giving rise to a reasonable belief that a person will commit a crime or is engaged in harassment or intimidation.

Plaintiff has not argued that this additional limitation is also unconstitutionally vague, but has instead focused primarily on the vagueness created by the statute's dependence on the term "legitimate business." This Court finds that subsection (2)(c)'s requirement that a principal or designee have "a reasonable belief that [the person] will commit a crime or is engaged in harassment or intimidation" prior to issuing an order to leave the school safety zone resolves the unconstitutional vagueness fatal to subsection (2)(b). Despite the statute's reliance on "legitimate business," the additional limitations are not unconstitutionally vague because the terms "reasonable belief," "harassment" and "intimidation" provide sufficient notice to enable ordinary people to understand what kind of conduct subsection 2(c) prohibits.

Of these terms, "harassment" is perhaps the least specific and most subjective. However, unlike the terms "legitimate business" and "annoy," which are not defined in any of Florida's penal statutes, the term "harassment" is defined as "engag[ing] in a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose." § 784.048(*l* )(a), Fla. Stat. Although this statutory definition of harassment makes use of the term "legitimate purpose," its reliance on acts directed towards a specific person resulting in substantial emotional distress is sufficiently specific to put an ordinary person on notice of proscribed conduct. *See U.S v. Eckhardt,* 466 F.3d 938, 943–44 (11th Cir.2006) (finding that federal statute criminalizing harassing phone calls was not unconstitutionally vague); *U.S. v. Bowker,* 372 F.3d 365, 381 (6th Cir.2004), *vacated on other grounds* 543 U.S. 1182, 125 S.Ct. 1420, 161 L.Ed.2d 181 (2005) (same).

■ This Court is cognizant that subsection (2)(c)'s applicability may be unclear in some situations. However, the test for unconstitutional vagueness is not whether the statute is unclear in some of its applications. A statute is only unconstitutional if it is "impermissibly vague in all of its applications." *Village of Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. 1186. Furthermore, any questionable application of the statute is always subject to an as-applied challenge. Therefore, subsection (2)(c) is not unconstitutionally vague.

c. Subsection (2)(a)

■ Subsection (2)(a) does not create any criminal penalty. Instead, it works in conjunction with subsections (b) and (c) by requiring a principal or designee to notify law enforcement to prohibit a non-exempt person from loitering in a school safety zone without "legitimate business." As such, subsection 2(a) sets the stage for enforcement of subsections (b) and (c). As merely a mandate to principals or their designee, it has little relevance without the means of enforcement provided in subsection (2)(b) or in conjunction with the additional limiting factors in subsection (2)(c). Nevertheless, because the mandate depends upon a determination of what conduct constitutes "legitimate business," this Court also finds the provision unconstitutionally vague for the reasons stated with respect to subsection (2)(b).

2. Arbitrary and Discriminatory Enforcement

■ A statute is unconstitutionally vague if it authorizes or encourages arbitrary and discriminatory enforcement. *Morales,* 527 U.S. at 56, 119 S.Ct. 1849; *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855. A legislature enacting a penal statute must "establish minimal guidelines to govern law enforcement." *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 39

L.Ed.2d 605 (1974)). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* (quoting *Goguen,* 415 U.S. at 575, 94 S.Ct. 1242).

■ Subsection (2)(b) of the School Safety Zone Statute contains no standard for law enforcement to ascertain when a person within a school safety zone is there on "legitimate business." *See Id.* "As such, the statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest." *Id.* Subsection (2)(b) therefore grants law enforcement with unbridled discretion and "entrusts lawmaking 'to moment-to-moment judgment of the policeman on his beat.'" *Goguen,* 415 U.S. at 575, 94 S.Ct. 1242 (quoting *Gregory v. City of Chicago,* 394 U.S. 111, 120, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969)). As a result, subsection (2)(b) of the School Safety Zone Statute "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Papachristou,* 405 U.S. at 170, 92 S.Ct. 839 (quoting *Thornhill v. Alabama,* 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). Although the necessity of providing children with safe and secure environs within and around educational areas is an interest of great importance, "it cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity." *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855. "Although due process does not require impossible standards of clarity, this is not a case where further precision in the statutory language is either impossible or impractical." *Id.* Therefore, subsection (2)(b) of

the School Safety Zone Statute is unconstitutionally vague because it authorizes and encourages arbitrary enforcement. For the reasons stated above in Section III(A)(1)(b) of this Order, subsection (2)(c) does not create the same potential for arbitrary enforcement. Subsection (2)(a) also lacks the potential for arbitrary enforcement because it contains no enforcement mechanism independent of subsections (2)(b) and (c).

### B. *Overbreadth*

■ "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales,* 527 U.S. at 52, 119 S.Ct. 1849 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). "Equally important, overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct." *Id.* at 613, 93 S.Ct. 2908. Instead, the preferred course of action is to reverse a conviction based on an unconstitutional application of a statute. *Id.* at 613–14, 93 S.Ct. 2908. "Additionally, overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner." *Id.* at 614, 93 S.Ct. 2908. "Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed ... sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■ Subsections (2)(a) and (b) have already been held unconstitutionally vague. Therefore, this Court need make no findings with respect to the potential overbreadth of these subsections. Here, subsection (2)(c) the School Safety Zone Statute prohibits a person from entering or remaining in a school safety zone without "legitimate business" where a principal or designee has reason to believe that a person will commit a crime or is engaged in harassment or intimidation of students. As such, the statute regulates conduct, not speech. Moreover, the statute does not proscribe conduct intended to convey a message. Subsection (2)(c) targets conduct evincing an intent to commit a crime or constituting harassment or intimidation of students. While there may be some plausible ways in which the statute may be applied unconstitutionally, those situations are not significant in comparison to the scope of the statute's permissible application. This Court finds that subsection (2)(c) is not overbroad because its impermissible applications are not substantial in relation to its plainly legitimate scope. *See Morales,* 527 U.S. at 52, 119 S.Ct. 1849; *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

### C. *Municipal Liability*

#### 1. Arrests by Officer Perez

■ Defendant Roth asserts that Plaintiff's claims against him in his official capacity should be dismissed because he cannot be held liable in his official capacity for the acts of Officer Perez. "A local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian v. Monroe County, Alabama,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (citing *Monell v. New York City Dept. of Socal Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "These policies may be set by the

government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.' " *McMillian*, 520 U.S. at 784, 117 S.Ct. 1734 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). "A court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.' " *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).[M]unicipal liability "may be imposed for a single decision by municipal policy makers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

 Based on the foregoing, the relevant questions are whether a Deputy or Officer of the Monroe County Sheriff is a final policymaking authority in matters of law enforcement in Monroe County or if there was a policy of unconstitutional enforcement of the School Safety Zone Statute in Monroe County. As an initial matter, in the absence of an applicable city or county ordinance to the contrary, a Florida county Sheriff acts as an arm of the county and is not entitled to Eleventh Amendment immunity. *See Abusaid v. Hillsborough County Comm'rs*, 405 F.3d 1298, 1313–14 (11th Cir.2005) (applying *Hufford's* four-factor test to determine that a County Sheriff enforcing a county statute acts as an arm of the county and is not entitled to Eleventh Amendment immunity)[3]; *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir.2005); *Hufford v. Rodgers*, 912 F.2d 1338 (11th Cir.1990); *see generally McMillian*, 520 U.S. at 784–97, 117 S.Ct. 1734. A Deputy or Officer in one of Flori-

da's county Sheriff departments does not constitute a final policymaking authority for the county because he does not stand in the shoes of the Sheriff and is under the chain of command of the Sheriff. *Brown v. Neumann*, 188 F.3d 1289, 1291 (11th Cir.1999) (stating that even in light of § 30.07, Florida Statutes, a Deputy Sheriff is not a final policymaker of a Florida county); *see Adcock v. Baca*, 157 Fed. Appx. 118, 120 (11th Cir.2005); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990). Therefore, a discretionary act by a Deputy or Officer, of which the County Sheriff does not know about, ratify or consent to, cannot constitute a final policy of the county. *Id.* Here, there is no evidence that Sheriff Roth directed Officer Perez to arrest the individuals handing out Bibles, or that Sheriff Roth knew about or consented to the arrests beforehand. In the absence of any such knowledge by Sheriff Roth, the arrests were a purely discretionary act of Officer Perez, and any chilling of Plaintiff's First Amendment rights must also be attributed to Officer Perez. As such, Officer Perez's decision to enforce the School Safety Zone Statute against the individuals handing out bibles does not constitute a policy of Monroe County.

 However, Officer Perez's arrest of the Gideons could become an act attributable to the County if the arrests were ratified by Sheriff Roth after the fact. If an authorized policymaker ratifies a subordinate's decision and the reasons for making the decision, the decision is chargeable to the municipality. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Garvie v. City of Fort Walton Beach, Fla.*, 366 F.3d 1186, 1189 (11th Cir.2004) (stating that a

---

**3.** The holding in *Abusaid* that a County Sheriff enforcing a county statute is not entitled to Eleventh Amendment immunity applies with equal force to a County Sheriff enforcing a state statute. *Abusaid's* application of the four-factor test in *Hufford* leaves no room for distinguishing between a County Sheriff's enforcement of a county versus a state statute.

municipality may become responsible for the conduct of a subordinate that a final policymaker ratifies by reviewing and manifesting approval). Here, there is no evidence that Sheriff Roth, the final policy-making authority in matters of law enforcement for Monroe County, ratified Officer Perez's arrests of the Gideons based on the fact that they were distributing Bibles within the school safety zone. When Sheriff Roth was asked if he thought that handing out Bibles in the school safety zone constitutes "legitimate business," he responded that as long as traffic was not disrupted and there were no other safety issues, handing out Bibles would be "legitimate business." Sheriff Roth Dep., at 27–28 (April 1, 2008). Hence, Monroe County cannot be said to have a policy of arresting citizens handing out Bibles within a school safety zone.

This Court notes that Sheriff Roth's Opposition to Plaintiff's Motion for a Preliminary Injunction (dkt. # 24) states that "[a] person such as Plaintiff is free to distribute bibles from a position that is 501 feet away from the school." Sheriff Roth's Opp. To Pl.'s Mot. for Prelim. Inj., at 6. However, weighing this statement contained in a legal argument made at an early stage in the proceedings against Sheriff Roth's personal response to a direct question concerning his interpretation of the applicability of the School Safety Zone Statute, this Court finds the latter statement most accurately reflects Sheriff Roth's view of the County's policy concerning enforcement of the statute in the circumstances at issue and that neither statement constitutes ratification of Officer Perez's actions. Therefore, Monroe County is not liable for the arrests conducted by Officer Perez.

### 2. Failure to Train

■ Plaintiff also asserts that Sheriff Roth's failure to conduct adequate training concerning enforcement of the School Safety Zone Statute resulted in unconstitutional conduct attributable to Sheriff Roth. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197. "[I]n light of the duties assigned to specific officers or employees the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." *Id.* at 390, 109 S.Ct. 1197. "For liability to attach ... the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391, 109 S.Ct. 1197; *see Bd. of the County Commrs. of Bryan County v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (stating that "[t]o prevent municipal liability from collapsing into *respondeat superior,* a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged").

■ Here, Plaintiff asserts that the absence of training with respect to enforcement of the School Safety Zone Statute constitutes deliberate indifference. This is true only if the need for training concerning enforcement of the School Safety Zone Statute was so obvious, and its absence so likely to result in a constitutional violation, that Sheriff Roth was deliberately indifferent to the rights of the citizens of Monroe County by failing to provide such training. However, there is no evidence suggesting that Sheriff Roth was on notice of prior instances of unconstitutional enforcement of the School Safety Zone Statute or that he had reason to believe that it would be enforced unconstitutionally. The statute is but one of a host of penal statutes that the Monroe County Sheriff is charged with

enforcing, and Sheriff Roth is not responsible for having divined in advance the potential unconstitutional applications of each. To find otherwise would give rise to a blanket imposition of liability for a Sheriff's failure to train his or her Deputies and Officers concerning every potential unconstitutional application of each of Florida's many penal statutes. Such a finding would also require a Sheriff to discern in advance which of the penal statutes might be subject to a facial challenge on constitutional grounds. Sheriffs are not lawyers and even if they were, they ought not be charged with ascertaining constitutional defects in penal statutes that escaped the legislators who enacted them.

While it is true that notice of prior unconstitutional enforcement is not necessarily required, this is not a case where the likelihood of unconstitutional enforcement was so obvious that Sheriff Roth was deliberately indifferent for failing to take action. In *City of Canton,* the Court stated that city policymakers "know to a moral certainty that their police officers will be required to arrest fleeing felons," giving rise to "the need to train officers in the constitutional use of deadly force." 109 S.Ct. at 1205 n. 10. However, this Court does not find that Sheriff Roth knew or should have known that his Deputies or Officers would be required to determine whether handing out bibles within a school safety zone would constitute "legitimate business" within the meaning of the School Safety Zone Statute.

Enforcement of the School Safety Zone Statute with respect to bible distribution, or even with respect to activities that may enjoy some measure of constitutional protection, is not such a core activity of police officers that a Sheriff can be said to know to a moral certainty of the constitutional problems that may precipitate from the School Safety Zone Statute's enforcement. Unlike giving chase to fleeing felons, which is an event that may flow from the breach of virtually any penal statute and is a constantly recurring event in law enforcement, the constitutional dimension of enforcing the School Safety Zone statute, which was enacted in 2002 and has scarcely been addressed by Florida's appellate courts, is not a matter of such magnitude that Sheriff Roth's failure to provide enforcement training was deliberately indifferent to the constitutional rights of Monroe County's citizens. Therefore, Sheriff Roth is not liable for failure to provide training concerning enforcement of the School Safety Zone Statute. Accordingly, the damages claim against Sheriff Roth in his official capacity must be dismissed.

The findings above dispose of all dispositive substantive issues. Therefore, this Court need make no additional findings.

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment (dkt. # 85) is GRANTED IN PART. Subsections 2(a) and 2(b) of § 810.0975, Florida Statutes, are declared unconstitutionally vague. The State of Florida and its officers are hereby permanently enjoined from enforcing these subsections. It is further,

ORDERED AND ADJUDGED that Defendant Richard D. Roth's Motion for Summary Judgment (dkt. # 84) is GRANTED.

The Clerk of the Court is ordered to CLOSE this case. All pending motions are DENIED AS MOOT.