# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 12, 2023          Decided July 7, 2023

No. 22-7047

DEVON TINIUS,
APPELLANT

v.

LUKE CHOI, D.C. METROPOLITAN POLICE OFFICER, ET AL.,
APPELLEES

———

Consolidated with 22-7048, 22-7049, 22-7050, 22-7051,
22-7052, 22-7053

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-00907)
(No. 1:21-cv-00909)
(No. 1:21-cv-00986)
(No. 1:21-cv-01460)
(No. 1:21-cv-01461)
(No. 1:21-cv-02377)
(No. 1:22-cv-00441)

———

*James A. DeVita* argued the cause and filed the brief for appellants.

*Holly M. Johnson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, at the time the brief was filed, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General.

Before: PILLARD and PAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Devon Tinius and six other Plaintiffs were arrested for violating a citywide temporary curfew in Washington, D.C., in June 2020. At the time of their arrests, Plaintiffs were standing on a public street peacefully protesting police killings of Black Americans. The protest was part of a nationwide wave of demonstrations sparked by the police killing of George Floyd on May 25 of that year. Not all responses to the killing were peaceful. A surge of rioting, vandalism, arson, and looting accompanied the mass protests in the District of Columbia and several other cities. Seeking to quell the violence and destruction, D.C. Mayor Muriel Bowser imposed a one-night curfew on May 31. The curfew barred virtually all activities in public spaces from 11:00 P.M. to 6:00 A.M. As increased nighttime crime continued, the mayor renewed the curfew for two more nights, extending it from 7:00 P.M to 6:00 A.M. Ms. Tinius and the other Plaintiffs allege they were out on the streets four hours after the start of the curfew on June 1, 2020, when they were arrested for violating the mayor's order.

Plaintiffs sued the arresting officers and the city for damages. Their principal claim is that, because they were engaging in peaceful public protests, their arrests for breaking the curfew violated their First Amendment rights. The district court granted the Defendants' motions to dismiss, holding that the June 1 curfew order was a constitutionally valid time, place, and manner restriction. The court held that the remaining claims also failed because they were contingent on the order's asserted invalidity under the First Amendment. We affirm.

## BACKGROUND

On May 25, 2020, Minneapolis police officer Derek Chauvin kneeled on the neck of George Floyd, an unarmed Black man, for nearly ten minutes. While Mr. Floyd gasped and cried for help, the officer suffocated him to death. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 821 (9th Cir. 2020); *State v. Chauvin*, No. 27-cr-20-12646, 2021 WL 2621001, at *4, *6 (Minn. Dist. Ct. June 25, 2021). A witness's video showing the final minutes of Mr. Floyd's life quickly circulated online. In cities and towns across the United States, masses of people poured onto the streets to express their outrage against police killings of Mr. Floyd and other Black Americans. *Index Newspapers LLC*, 977 F.3d at 821.

In Washington, D.C., as in some other cities, peaceful demonstrations coincided with incidents of rioting, vandalism, looting, and arson. On May 31, 2020, D.C. Mayor Muriel Bowser moved to protect public safety by imposing a one-night curfew order (the May 31 Order). The Order recognized the "outrage that people [felt] following the murder of George Floyd in Minnesota" the previous week, along with grief over "hundreds of years of institutional racism." J.A. 29. The May 31 Order also recounted that vandalism and other crimes had occurred in the city's downtown area over the previous several

nights: In downtown D.C., "numerous businesses and government buildings were vandalized, burned, or looted" and officials observed a "glorification of violence, particularly during later hours of the night." J.A. 29. The Order stated that the "health, safety, and well-being of persons within the District of Columbia [were] threatened and endangered by the existence of these violent actions." J.A. 30. The Order also invoked the need to protect public health during the state of emergency then in place in response to the COVID-19 pandemic. It recounted that, contravening an emergency order already in effect, "[m]any protesters are not observing physical distancing requirements and many protestors are not wearing masks or face coverings." J.A. 30.

The May 31 Order imposed a curfew from 11:00 P.M. that night until 6:00 A.M. the following day. During those hours, the order stated, "no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District." J.A. 30. The curfew exempted "[i]ndividuals performing essential duties as authorized by prior Mayor's Orders, including working media with their outlet-issued credentials and healthcare personnel." J.A. 30.

On June 1, after another night of destruction, Mayor Bowser renewed the curfew for that night and the next. The new curfew order incorporated the May 31 Order's statements and included some new ones. According to the June 1 Order, in "multiple areas" of the city, "numerous businesses, vehicles, and government buildings" were "vandalized, burned, or looted," and over 80 people had been arrested "in connection with [those] incidents, with the majority charged with felonies." J.A. 31. The June 1 Order recounted that, "[o]n the night of May 31, 2020," despite the initial curfew, "looting and

vandalism occurred at multiple locations throughout the city, in addition to the rioting in the downtown area." J.A. 31. "Vandals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District." J.A. 32. The June 1 Order stated that "[r]ioting and looting affected the operations of District government agencies." J.A. 32. As for public health, the Order reiterated that gatherings of more than ten people violated the COVID-19 emergency declaration. *Id.*; *see* District of Columbia Office of the Mayor, *Extensions of Public Emergency and Public Health Emergency and Preparation for Washington, DC Reopening* at 7 (May 13, 2020), https://perma.cc/N8ZF-V9FN (last updated June 27, 2023).

The June 1 curfew started earlier than the previous night's, at 7:00 P.M. instead of 11:00 P.M. And it added to the previous order's carveout for "essential" media and healthcare workers a new exemption for individuals "who are voting and participating in election activities." J.A. 32. Violators of the June 1 Order could face misdemeanor penalties: a fine of up to $300, or up to ten days' imprisonment. J.A. 33. The Order did not require police officers to give people an opportunity to disperse before arresting them for violating the curfew.

Plaintiffs allege that, at "approximately 11:00 P.M." on June 1, "near Lafayette Park and the White House," Devon Tinius and the other Plaintiffs were "standing with a group of like-minded citizens protesting the treatment of African American citizens by the police." J.A. 36-37 (Compl. ¶ 8). Members of the group were "shouting 'Black Lives Matter' and saying the names of individuals" including George Floyd and Breonna Taylor, whom they "believed had been killed by

police officers without legal justification." J.A. 36-37 (Compl. ¶ 8). D.C. Metropolitan Police arrested Plaintiffs for violating the June 1 Order. Before their arrests, Plaintiffs "attempted to leave the area and to return home," but the police officers "continually blocked the path of the demonstrators and refused to allow them to leave." J.A. 37 (Compl. ¶ 9). Plaintiffs were arrested, detained overnight, and released after arraignment the next morning. In October 2020, the government dismissed all the charges against Plaintiffs.

In 2021, the seven individual Plaintiffs each sued the arresting officers under 42 U.S.C. § 1983 for First, Fourth, and Fourteenth Amendment violations. (As the district court noted, the complaints contain "substantially identical" allegations. *Tinius v. Choi*, No. 21-cv-0907, 2022 WL 899238, at *1 n.1 (D.D.C. Mar. 28, 2022)). For simplicity, we cite to the Tinius complaint.) Plaintiffs claimed that, by arresting them while they were peacefully protesting, the officers violated their First Amendment rights to freedom of speech and assembly. They argued that the June 1 Order is invalid under the First Amendment because it did not exempt people engaging in public protests or other expressive activity. They did not, however, challenge the Order's limited exemptions as content based. Asserting that the June 1 Order was invalid, they claim the officers lacked probable cause to arrest them and that the arrests amounted to excessive force in violation of the Fourth Amendment. Alongside those constitutional claims, Plaintiffs asserted common-law claims of false arrest, assault, and battery against the officers and, on a theory of *respondeat superior*, against the District of Columbia. Defendants removed the suits to federal court and moved to dismiss the complaints.

The district court consolidated seven Plaintiffs' complaints and granted Defendants' motion to dismiss. Starting with the First Amendment challenge, the court first

considered whether the June 1 Order restricted Plaintiffs' expression. The order addressed "a broad swath of pure conduct" so arguably need not be scrutinized as "a restriction on expression at all." *Tinius*, 2022 WL 899238, at *9. But the court acknowledged that "the curfew was enacted in the specific context of ongoing public protests and counter-protests" and reached some expressive conduct. *Id*. Viewing it as a close question whether the order was a time, place, and manner restriction of speech or merely had the incidental effect of curtailing speech, the court noted that "the Supreme Court has made it clear that 'the *O'Brien* test in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions.'" *Id*. (citing *United States v. O'Brien*, 391 U.S. 367 (1968), and quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Proceeding "in an abundance of caution" to apply First Amendment intermediate scrutiny appropriate to time, place, and manner restrictions, *see Ward*, 491 U.S. at 791, the district court sustained the June 1 Order, concluding that the curfew was narrowly tailored to significant government interests in public safety and public health and left open the alternative of daytime protests. *Id.* at *9, *12.

Plaintiffs' remaining claims are largely contingent on their assertion that the June 1 Order was void as an unconstitutional speech restriction, so once the district court rejected the First Amendment claim, it dismissed the other claims as well. Finally, because the June 1 Order plainly stated what it prohibited, the district court denied as futile Plaintiffs' motion to amend the complaints to add vagueness and overbreadth challenges.

Plaintiffs appealed. The appeal presses their freedom-of-expression and vagueness challenges to the curfew order, and their claims that the consequent invalidity of the curfew order

renders their arrests unlawful under both the Constitution and D.C. common law.

## DISCUSSION

Plaintiffs allege that they were engaged in expressive activity on public sidewalks in the District of Columbia during curfew hours on June 1, 2020, when the D.C. Police arrested them. They do not assert that their conduct complied with the terms of the June 1 Order. Their First Amendment challenge rests on their contention that, because they were peacefully "engaged in the type of political speech meant to be protected by the First Amendment," Appellants' Br. 4, the June 1 Order should have been subjected to strict scrutiny. Plaintiffs do not, however, claim they were arrested based on their expression.

Alternatively, Plaintiffs argue that the order fails the intermediate scrutiny applicable to restrictions on the time, place, and manner of expression. They do not dispute the substantiality of the government's interests in protecting public safety by quelling an outbreak of violent crime, but contend the order was neither content-neutral nor narrowly tailored. Plaintiffs also contend that the curfew order was unconstitutionally vague because it included public "loitering" among the nighttime activities it barred. Based on their view that the curfew they violated was itself invalid, Plaintiffs challenge their arrests on constitutional and common-law grounds as unsupported by probable cause and an exercise of excessive force. Finally, they argue the June 1 Order violated their right to travel within the District of Columbia, but they made no such claim in the district court so forfeited it.

On behalf of the officers, the District of Columbia responds that, to the extent the temporary, content-neutral curfew order limited Plaintiffs' expressive activities, it was a valid time, place, and manner restriction: "[T]he curfew

satisfied the First Amendment because it was narrowly tailored to serve the District's critically important interest in suppressing the surge in violence and destruction across the city during the nighttime hours." Appellees' Br. 34. The District points out that Plaintiffs' constitutional and common-law challenges to the arrests depend on the success of their claim that the June 1 Order violates the First Amendment. In the absence of any allegations that the officers used unnecessary force in effecting the arrests, the District argues that the arrest claims fail with the challenge to the June 1 Order.

On *de novo* review, *Shaffer v. George Washington Univ.*, 27 F.4th 754, 762 (D.C. Cir. 2022), we affirm the district court's judgment dismissing the complaints for failure to state a claim. In this posture, we accept the facts and all reasonable inferences that may be drawn from them in Plaintiffs' favor. *See id.* at 763. As did the district court, we treat the existence and content of the legally operative public curfew orders as common ground. We see no need to invoke doctrines of judicial notice or incorporation by reference in order to reference the curfew orders as we would any source of local law.

We hold that the June 1 Order was a constitutionally valid time, place, and manner restriction that gave fair notice of the prohibited conduct. The balance of Plaintiffs' claims depends on the asserted invalidity of the curfew order. In light of our decision to sustain the order, we also affirm the dismissal of the remaining claims.

## A.

The District of Columbia does not dispute that Plaintiffs engaged in First Amendment-protected expression, so we first consider the appropriate level of scrutiny to apply to the June 1 Order. *See Green v. DOJ*, 54 F.4th 738, 745 (D.C. Cir. 2022).

We apply strict scrutiny to content-based restrictions on expression, and intermediate scrutiny to content-neutral restrictions. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). Intermediate scrutiny applies here because the governmental interest supporting the June 1 Order was "unrelated to the suppression of free expression," *O'Brien*, 391 U.S. at 377, and did not "appl[y] to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (defining content-based regulations). The mayor adopted the curfew as a short-term emergency measure to prevent nighttime vandalism, arson, and looting. The challenged order prohibited people from going out in public during specified hours; it barred virtually all nighttime public activity, without regard to its expressive character or message. And it did so in a limited, appropriately tailored way that left room for Plaintiffs' expression.

On appeal, Plaintiffs do not dispute that the June 1 Order was content-neutral on its face. They claim strict scrutiny is appropriate because they were in fact engaged in peaceful public expression. In the alternative, they argue that they should have had an opportunity through discovery to develop a claim that the curfew was selectively enforced against them based on their speech. Their first rationale does not support strict scrutiny, and the second was not raised in the district court.

Treating the curfew order as a content-neutral time, place, and manner restriction, we apply intermediate scrutiny. To determine whether the Order comports with the First Amendment, we ask whether it served significant government interests, was narrowly tailored to those interests, and left open ample alternative channels for speech. *Turner Broadcasting*, 512 U.S. at 642; *Ward*, 491 U.S. at 791. Plaintiffs do not

dispute that the interests stated in the Order—"to protect the safety of persons and property in the District" and "to reduce the spread of [COVID-19] and to protect the public health," J.A. 32—are significant government interests unrelated to the suppression of expression. Our analysis therefore turns on the second and third requirements: whether the June 1 Order was narrowly tailored to serve the identified public safety and public health interests, and whether the two-night curfew allowed ample alternative channels for protestors to communicate their messages opposing police violence against Black people.

A time, place, or manner restriction on speech is "narrowly tailored" so long as it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Such a restriction may survive as narrowly tailored even if it is not "the least restrictive or least intrusive means" of serving the government interest. *Id.* at 798.

Mayor Bowser imposed the limited, temporary curfew order in an incremental process in response to a spike in serious crime. As the Order explained, "numerous businesses, vehicles, and government buildings [had] been vandalized, burned, or looted." J.A. 31. In the two days preceding the June 1 Order, more than 80 people were arrested in connection with the vandalism, burning, and looting, "with the majority charged with felonies." *Id.* The order recounted that "looting and vandalism occurred at multiple locations throughout the city," and "[r]ioting and looting affected the operations of District government agencies." J.A. 31-32. The initial May 31 Order, incorporated into the June 1 Order by reference, noted that these crimes were particularly prevalent "during later hours of the night." J.A. 29. Mayor Bowser imposed a one-night curfew on May 31, and only after looting and vandalism

continued that night did she impose the two-night curfew at issue here.  That measured approach shows tailoring to the public safety interest:  The mayor imposed a two-night, eleven hour-long curfew only after a one-night curfew lasting seven hours had failed to fully restore order.

Plaintiffs challenge the Order's tailoring by arguing that it should have included an exception for First Amendment activity.  They point to the First Amendment exceptions in long-term juvenile curfews, including the juvenile curfew we upheld in *Hutchins v. District of Columbia*, 188 F.3d 531, 546 (D.C. Cir. 1999), to argue that the June 1 Order should have exempted individuals exercising their First Amendment rights.  But the ordinance at issue in *Hutchins* operates differently and serves interests distinct from those supporting the temporary June 1 Order.

In *Hutchins*, we reviewed a juvenile-only curfew of unlimited duration that the D.C. Council put in place after "determining that juvenile crime and victimization in the District was a serious problem."  *Hutchins*, 188 F.3d at 534; *see* D.C. Code §§ 2-1542, 2-1543.  Unlike the two-day emergency order under review here, that curfew was not time limited—indeed, it remains on the books.  It bars minors ages 16 and under from venturing out in public without adult supervision after 11:00 P.M. on weeknights and after midnight on weekends, subject to eight broad exceptions.  *Hutchins*, 188 F.3d at 534.  To "ensure that the ordinance does not sweep all of a minor's activities into its ambit but instead focuses on those nocturnal activities most likely to result in crime or victimization," *id.* at 545, the juvenile curfew allowed young people to go out alone at night for the purpose of attending official school activities, "going to or from employment," or "exercising First Amendment rights." *Id.* at 535.  The curfew's limitation to minors without adult supervision, and its generous

allowance for unaccompanied minors to go out during curfew hours for various activities that the Council deemed age-appropriate and constructive, serve the curfew's overall purpose to "protect the welfare of minors by reducing the likelihood that minors will perpetrate or become victims of crime and by promoting parental responsibility." *Id.* at 541-42.

The June 1 Order imposed a very different kind of curfew. It sought to temporarily clear the streets at night to curb a sudden rise in rioting, vandalism, arson, and looting. It applied to adults and minors alike, with narrow exceptions for essential activities. If the Order had excepted expressive activity, as Plaintiffs argue the First Amendment required, it would have left D.C. officials in the same position as before the curfew: hindered by the unusual volume of people on the streets from stemming the vandalism and looting. An expressive-activity exception would have effectively enabled public circulation of people intent on looting, so long as they traveled with demonstrators, wore protest messages, shouted political slogans, or carried placards.

The curfew challenged here is more like the temporary restriction the Ninth Circuit upheld in *Menotti v. City of Seattle*, 409 F.3d 1113, 1118 (9th Cir. 2005), than the permanent but porous juvenile curfew at issue in *Hutchins*. *Menotti* sustained as a constitutional time, place, and manner restriction an order temporarily barring most public access to parts of downtown Seattle during the 1999 World Trade Organization conference. *Id.* at 1117-18. City officials imposed that order after vandalism and violence broke out during large-scale nonviolent protests, *id.* at 1120, 1123, "mutual insecurity among police and protestors caused the situation to spiral out of control," *id.* at 1122, and routine policing proved inadequate because offenders "were able to elude capture" by escaping into crowds of nonviolent protestors, *id.* at 1132. Faced with

an "emergency situation" in which "law-breaking and law-abiding protestors were often indistinguishable," *id.* at 1135, the City's imposition of access restrictions was appropriately tailored to the government's public safety interest, *id.* at 1137. Like the restriction sustained in *Menotti*, the temporary June 1 Order enabled the city to restore order in the face of a wave of vandalism occurring in the midst of large-scale peaceful protests.

The public health interest in preventing large gatherings also supported the District of Columbia's decision to choose a curfew on June 1, 2020, over other methods of addressing the wave of nighttime crime. That spring, the COVID-19 pandemic in the United States was in an acute phase. Centers for Disease Control and Prevention, *Previous U.S. COVID-19 Case Data* (Aug. 27, 2020), https://perma.cc/L35Z-8KHR (last updated June 27, 2023). In mid-March, President Trump had declared the novel coronavirus a national emergency. White House Archives, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://perma.cc/7FRL-2L2W (last updated June 27, 2023). The vaccines were not yet available; public health policy then in effect for the United States and the District of Columbia called for physical distancing and limiting large gatherings. *See In re Approval of Jud. Emergency Declared in Cent. Dist. of California*, 955 F.3d 1140 (9th Cir. 2020) (citing April 2020 guidance of the U.S. Centers for Disease Control and Prevention); District of Columbia Office of the Mayor, *Extensions of Public Emergency and Public Health Emergency and Preparation for Washington, DC Reopening* at 7 (May 13, 2020), https://perma.cc/N8ZF-V9FN (last updated June 27, 2023) (barring gatherings of more than ten people not from the same household). An alternative to the curfew that might have served the public safety interest alone, like a protected zone for

nighttime peaceful protests, would have impeded the city's interest in preventing the spread of COVID-19 by directing protestors to congregate in protest zones.

Plaintiffs do not challenge the citywide scope of the curfew. They make no argument that, to be narrowly tailored, the order should have been limited to the neighborhoods in which city officials reported violence had already taken place. In any event, the order recounted that vandalism had occurred across multiple areas of the city: "smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown" and "extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District." J.A. 32. Plaintiffs were arrested near Lafayette Park, within the very Business Improvement Districts the Curfew Order identified. Even if they had chosen to press for narrower geographic tailoring, it is unclear in view of those allegations whether Plaintiffs would have had standing to challenge the order's applicability to areas the order did not cite as having been hit by violence because those were not areas in which they sought to protest.

Finally, the Order leaves open ample alternative channels of communication. The relevant expressive channels are those within the same forum. *Initiative and Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1310-11 (D.C. Cir. 2005). In the areas covered by the challenged Order, protestors had two alternatives: They were free to protest during the day between the hours of 6:00 A.M. and 7:00 P.M., and to protest at night after the two-day curfew expired. The Plaintiffs never alleged or argued that they could not have taken advantage of either opportunity.

In sum, the June 1 Order is a valid time, place, and manner restriction. It satisfies the applicable intermediate scrutiny. The Order is content neutral, barring virtually everyone from the public streets without distinctions based on their topic or message or, indeed, whether they engaged in any expression at all. Public safety and preventing the spread of COVID-19, the two justifications the Order cites, are both undisputedly significant government interests. The curfew was narrowly tailored to those interests. The restrictions were calibrated to serve the government's stated interests. They were limited to nighttime hours, applied for just two nights, and were only imposed after the city's earlier, one-night curfew failed to quell the wave of crime. Including an expressive-activity exception in the curfew would have allowed more hours of speech by protestors, but it also would have impeded the public safety and public health objectives of the curfew. The government met its burden to show that the curfew was not "substantially broader than necessary" and did not "burden substantially more speech than [was] necessary" to achieve the public safety interest. *Ward*, 491 U.S. at 799-800. And the nighttime-only restrictions left open ample alternative channels by allowing daytime protests or protests on ensuing nights.

Plaintiffs argue that the district court erred in dismissing the complaints before discovery. But they still have not explained how discovery could have been relevant to their facial challenges to the Order. Plaintiffs cite *Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164 (D. Col. 2022), in which the plaintiffs obtained discovery that revealed that a facially speech-neutral curfew was enforced in practice to retaliate against protesters based on their speech. *Id.* at 1172-73. But *Epps* is inapposite. Plaintiffs in *Epps* alleged that police practiced a targeted enforcement policy that differed from the neutral text of the policy as written; the Complaints in this case made no such claims.

Plaintiffs argue that the two-night curfew "destroyed their ability to speak at a time when what they had to say was most effective," Appellants' Br. 16, *i.e.,* in the immediate aftermath of the murder of George Floyd. But "[e]ven protected speech is not equally permissible in all places and at all times." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (quoting *Frisby v. Schultz*, 487 U.S. 474, 479 (1988)). For example, even though an ordinance barring "any noise or diversion which disturbs or tends to disturb" learning during school hours curbed speech at a time and place that the protesters reasonably preferred, the Supreme Court upheld it as a fitting means to serve important interests in avoiding disruption of classwork inside the building. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 117-21 (1972). The Court likewise sustained an ordinance banning picketing "directed at a single residence" as appropriately tailored to the city's interest in "protecting the well-being, tranquility, and privacy of the home." *Frisby*, 487 U.S. at 483-84, 488. A ban on sleeping in national parks comported with the First Amendment even when "applied to prohibit demonstrators from sleeping in Lafayette Park and the [National] Mall . . . to call attention to the plight of the homeless," because it was content-neutral and sufficiently tailored to the "Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289, 296 (1984).

The right to gather together in public spaces, call out injustice, and demand action is fundamental to a free and democratic society. Throughout our history, the people and groups that make up our fractious pluralism have shown up and spoken out. The First Amendment protects those rights. But it does not privilege expression irrespective of its timing, location, or mode. Our Constitution provides for ordered liberty. Even though the June 1 Order limited some valuable

opportunities for public speech and association, the public interest in keeping the peace by responding effectively to a surge in vandalism, arson, and looting was not directed at the suppression of expression, and it justified the June 1 Order's temporary restriction on nighttime activity in public spaces.

**B.**

We next consider Plaintiffs' vagueness challenge. The June 1 Order stated in plain terms that it generally forbade people from venturing out in public during curfew hours on June 1 and 2, 2020. The relevant portion of the Order states: "During the hours of the curfew, no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District." J.A. 32 (June 1 Order). The Order thereby gave fair notice to members of the public of the conduct it prohibited and afforded sufficient guidance to law enforcement.

Plaintiffs' sole vagueness challenge is that the June 1 Order "seeks to criminalize 'loitering.'" Appellants' Br. 18. They argue that inclusion of "loitering" on the list of prohibited public activities rendered the order fatally vague. A statute is unconstitutionally vague under the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Plaintiffs see both types of vagueness in the Order: They assert that that an ordinary person would not know what conduct counts as prohibited "loitering," and that the Order "leav[es] it up to *the police* to decide what the term 'loitering' means." Appellants' Br. 18-19 (emphasis in original). Both arguments miss the mark. The June 1 Order did not target loitering in isolation,

and the order's temporary ban on all kinds of nighttime public activity made "clear what the [Order] as a whole prohibits." *Grayned*, 408 U.S. at 110.

First, the Order gave notice "that will enable ordinary people to understand what conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "Loiter" means "to remain in an area for no obvious reason," *Loiter*, MERRIAM-WEBSTER'S DICTIONARY, https://perma.cc/JW2F-27RW (last updated July 3, 2023), or "to linger idly about a place," *Loiter*, OXFORD ENGLISH DICTIONARY, https://perma.cc/PBK7-YQXB (last updated July 3, 2023). To determine whether the statute provided fair notice, we read "loiter" in context, applying the *noscitur a sociis* canon: "a word is known by the company it keeps." *See United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017). Ordinary people reading "loiter" among the list of other activities the curfew order prohibited, including "walk," "run," and "stand," would understand that they were generally prohibited from being in a public place during curfew hours. Indeed, Plaintiffs allege that they were "standing" in a public place after curfew hours, J.A. 37 (Compl. ¶ 8), so their conduct would have been prohibited even if the activities the order listed had not included loitering. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010); *Hodge v. Talkin*, 799 F.3d 1145, 1172 (D.C. Cir. 2015).

Second, the Order did not "authorize" or "encourage arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56. Including loitering in a list of prohibited activities that also generally bars walking, biking, running, standing, or "motor[ing] by car or other mode of transport" in any public place during curfew hours, J.A. 32 (June 1 Order), does not confer "vast discretion" on the police to draw their own distinctions between violative and lawful conduct. *Morales*, 527 U.S. at 61. If anything, including a prohibition on loitering

20

in the curfew order reduced police discretion by filling any potential gaps in the ban on public activities. "As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible." *Grayned*, 408 U.S. at 114.

The challenged curfew order is wholly different from "loitering" provisions that empower officers to make unguided distinctions between criminal loitering and innocent hanging out. Plaintiffs claim that "*[e]very* Court" to have addressed "a statute with the term 'loitering' in it" has held it to be unconstitutionally vague. Appellants' Br. 19 (emphasis in original). They are mistaken. The word "loitering" is not a First Amendment poison pill. In *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965), for example, the Supreme Court rejected a vagueness challenge to a law making it unlawful "to so stand, loiter or walk upon any street or sidewalk in the city as to obstruct free passage" insofar as the statute had been authoritatively construed to apply to persons who "block[ed] free passage." *Id.* at 88, 91. And the cases invalidating laws that criminalized loitering, including *City of Chicago v. Morales*, 527 U.S. 41 (1999), and *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), did not involve general curfews. Rather, they addressed provisions targeting "loitering" as such, framed in ways that conferred impermissible discretion on arresting officers.

The ordinance in *Morales* defined "loitering" in subjective terms, as "remain[ing] in any one place with no apparent purpose," and banned two or more "criminal street gang members" from "loitering" in a public place after a police officer ordered them to disperse. 527 U.S. at 47. Because it gave police officers "absolute discretion" to make "inherently subjective" distinctions between people with an "apparent purpose" and those without one, the Court held the ordinance

unconstitutionally vague. *Id.* at 61-62, 66. The June 1 Order, however, requires no law enforcement officer's assessment of anyone's "apparent purpose."

The ordinance challenged in *Papachristou v. City of Jacksonville*, 405 U.S. 156, similarly invited an unconstitutional degree of discretion on the part of police enforcing its "loitering" ban. The ban applied to people the ordinance classed as "vagrants," including "common drunkards," "habitual loafers," and "persons wandering or strolling around from place to place without any lawful purpose or object." *Id.* at 156 n.1, 162 (internal citations and quotation marks omitted). Those terms were not objective indicia of observable behavior that could give fair notice to potential violators or inform arresting officers. *Id.* at 162. The June 1 Order, in contrast, prohibited virtually all activities in public spaces during curfew hours, not an undefined and indistinct subset of activities deemed somehow nefarious. Because it thereby provided adequate notice to the public and controlled officers' discretion, we hold it was not unconstitutionally vague.

## C.

Plaintiffs' remaining claims depend on their primary contentions that the curfew was an unjustified speech restriction or wholly vague, so legally void. If the curfew order they violated was unlawful, they claim, their arrests infringed the Fourth Amendment prohibition against "unreasonable . . . seizures," U.S. CONST. amend. IV, and the arresting officers' contact with them amounted to assault and battery. But Plaintiffs do not dispute that they were present in public in violation of the terms of the curfew, which was justification enough. The legal insufficiency of the common law and Fourth

Amendment claims follows from our dismissal of the First Amendment claim.

"Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action." *Amobi v. D.C. Dep't of Corrections*, 755 F.3d 980, 989 (D.C. Cir. 2014). We analyze the legal sufficiency of both types of claims by asking whether, assuming the truth of the facts in the complaint, the police had probable cause to arrest. *Id.* Probable cause justifies arrest "where the facts and circumstances within the arresting officer's knowledge, of which [the officer] had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." *Id.* at 990 (quoting *Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983)); *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Probable cause is a question of law for the court to decide "where the facts are undisputed." *Amobi*, 755 F.3d at 990; *see Ornelas v. United States*, 517 U.S. 690, 696-97 (1996).

Plaintiffs allege that they were "standing" in public at 11:00 P.M. on June 1, four hours after the curfew ended. J.A. 37 (Compl. ¶ 8). That allegation alone confirms that the police had probable cause to arrest Plaintiffs for violating the June 1 Order, under which no person was allowed to "stand" in any "public place within the District" after 7:00 P.M. on June 1. J.A. 32. Plaintiffs argue that the police should have given them an opportunity to "comply with the curfew law by leaving the scene." Appellants' Br. 25. But, unlike a temporary curfew order issued by Mayor DeBlasio in New York City around the same time, *see In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 408, 416 (S.D.N.Y. 2021), the District of Columbia's June 1 Order did not require police to give curfew violators an opportunity to avoid arrest by agreeing to disperse. Plaintiffs accordingly fail to state

claims of arrest without probable cause in violation of the Fourth Amendment, or of common-law false arrest.

Plaintiffs' claims of excessive force in violation of the Fourth Amendment and their common-law assault and battery claims also fall short. We evaluate claims of excessive force by considering whether an officer's use of force was "reasonable" under the "facts and circumstances of [the] particular case . . . judged from the perspective of a reasonable officer." *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The parallel common-law claims turn on whether an officer committed assault through "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff" or committed battery through "an intentional act that causes a harmful or offensive bodily contact." *Smith v. District of Columbia*, 882 A.2d 778, 787 (D.C. 2005) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)). Under D.C. law, a "police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the [officer] reasonably believes to be necessary." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)).

Plaintiffs allege that, by arresting them, the officers "touch[ed] [them] without [their] consent and without having legal justification." J.A. 39 (Complaint ¶ 24). But, again, the officers had legal justification to arrest Plaintiffs: The officers saw them gathered in public after 11:00 P.M., in violation of the constitutionally valid June 1 Curfew Order. Plaintiffs make the conclusory allegation that the officers "use[d] excessive force while arresting [them]," J.A. 40 (Compl. ¶ 33), but their complaint describes no unconsented touching or use of force

beyond the bare fact of their arrests. Plaintiffs included an allegation that their overnight detention in handcuffs injured their wrists, but they sued the arresting officers, not persons responsible for the conditions of their detention. That allegation thus does not support an excessive force claim against these Defendants. We accordingly affirm the district court's dismissal of Plaintiffs' claims of excessive force and assault and battery.

**D.**

Finally, Plaintiffs argue that the June 1 Order violated their fundamental right to travel, but that claim is forfeited. Plaintiffs neither pleaded nor pressed a right-to-travel claim in the district court. Br. in Opp'n to Defs.' Mot. to Dismiss at 4-5, 7-8, *Tinius v. Choi*, No. 21-cv-907, 2022 WL 899238 (D.D.C. Mar. 28, 2022).[1] We have previously declined to resolve the unsettled question whether the Constitution protects a right to intrastate travel. *Hutchins*, 188 F.3d at 536-41 (plurality opinion). The circuits are split on the point, and the Supreme Court has yet to resolve it. *See Cole v. City of Memphis*, 839 F.3d 530, 535 & n.3 (6th Cir. 2016) (collecting cases); *Morales*, 527 U.S. at 53-54 (three-justice plurality) (describing "an individual's decision to remain in a public

---

[1] Plaintiffs Ajokubi, Maradiga, Smith, and Southee filed opposition briefs identical to Tinius' in their cases. Br. in Opp'n to Defs.' Mot. to Dismiss, *Ajokubi v. Maneechai*, No. 21-cv-909; Br. in Opp'n to Defs.' Mot. to Dismiss, *Maradiga v. Kern*, No. 21-cv-1460; Br. in Opp'n to Defs.' Mot. to Dismiss, *Smith v. Perez*, No. 21-cv-986; Br. in Opp'n to Defs.' Mot. to Dismiss, *Southee v. Varga*, No. 21-cv-1461. Plaintiffs Brown and Green filed different opposition briefs, but those, too, made no mention of the fundamental right to interstate travel. Br. in Opp'n to Defs.' Mot. to Dismiss, *Brown v. Choi*, No. 22-cv-441; Br. in Opp'n to Defs.' Mot. to Dismiss, *Green v. Smith*, No. 21-cv-2377.

place of his choice" as a fundamental right protected by the Due Process Clause).  Given Plaintiffs' failure to preserve the issue, the unsettled state of the law, and the officers' entitlement to qualified immunity against claims not clearly established, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), we decline to exercise our discretion to consider the unpreserved claim of violation of an asserted right to travel.

\* \* \*

For the foregoing reasons, we affirm the district court's judgment dismissing Plaintiffs' claims.

*So ordered.*